STATE OF NORTH CAROLINA v. JERRY WAYNE TURNAGE

No. 441A90

(Filed 3 April 1991)

**Homicide § 21.7 (NCI3d) — second degree murder — contention that shooting accidental — motion to dismiss denied**

The State's evidence sufficiently contradicted defendant's claim of accident and the denial of his motion to dismiss a second degree murder charge was proper where, taking the evidence in the light most favorable to the State, a jury could reasonably infer that there was hostility and a history of violence between defendant and the victim; intent to commit murder and suicide could be inferred from defendant's question to his daughter about her future if something happened to himself and her mother; the only loaded weapon found on defendant's premises after the shooting had the safety on; the weapon involved in the killing was tested, the safety functioned properly, and the gun would not fire when struck against the floor or when a weight was dropped on it; defendant was a hunter, familiar with firearms, and handled them safely; the pathologist testified that the firearm was at least two feet from the victim's head when it discharged; the jury could infer from the evidence that defendant intentionally fired the weapon while he was standing and that the victim's hands were in a position parallel to the path of the bullet and not on the gun when it fired; the physical evidence contradicted defendant's claim of accident; and defendant admitted that he had had the trig-

ger end of the gun and said after the killing, "I have killed my wife."

**Am Jur 2d, Homicide §§ 112, 272, 421, 425.**

APPEAL by the State pursuant to N.C.G.S. § 7A-30(2) from a divided panel of the Court of Appeals, 100 N.C. App. 234, 395 S.E.2d 156 (1990), reversing the judgment of *Reid (David E.), J.,* sentencing defendant to twenty years imprisonment upon his conviction for second-degree murder by a jury at the 7 March 1989 Criminal Session of Superior Court, CRAVEN County. Heard in the Supreme Court 13 February 1991.

*Lacy H. Thornburg, Attorney General, by James Peeler Smith, Special Deputy Attorney General, for the State-appellant.*

*David P. Voerman for the defendant-appellee.*

MARTIN, Justice.

On 17 November 1988, Carolyn Bell Turnage died of a gunshot wound to the head. Her estranged husband, Jerry Wayne Turnage, was convicted of second-degree murder for her death. A divided panel of the Court of Appeals held that the State's evidence did not contradict defendant's extrajudicial exculpatory statements that the shooting was accidental and therefore reversed defendant's conviction. Judge Greene dissented, concluding that there was circumstantial evidence from which reasonable minds might conclude that defendant intended to kill his wife. *State v. Turnage,* 100 N.C. App. 234, 395 S.E.2d 156 (1990). The State appealed. We agree with the State's contention that there was sufficient evidence to contradict defendant's exculpatory statements and reverse the Court of Appeals.

The State's evidence tended to show that defendant and his wife separated in August 1988. Carolyn Turnage asked defendant to move out before Tiffany, his daughter from a previous marriage, came for an extended visit. Tiffany's presence had caused problems in the past, because Carolyn felt she had no authority to discipline Tiffany and defendant would not discipline her to Carolyn's satisfaction. One argument on that subject led to a physical confrontation between the couple. Defendant had adopted Carolyn Turnage's daughter, Tracy, when the couple married. When they separated, Tracy remained in the home, but visited her adoptive father at

his sister's home once or twice a week. She would usually go there after school or work and spend the night. Tracy was sixteen at the time of the trial. Defendant remained on good terms with his family until a few weeks before the shooting.

Charles Overly was a customer of Carolyn's at Raleigh Federal Savings Bank where she was office manager. Carolyn introduced him to defendant because both were interested in hunting. Overly became good friends with both defendant and his wife. He testified that about two weeks before the shooting, he saw defendant at a bar. Defendant told him that Carolyn was coming to the bar with her boyfriend and he wished that he had his gun. Later, Overly saw Carolyn at the bar with a group of people, and he talked with her. Defendant grabbed Overly's arm and said, "Don't mess with my wife." Overly also testified that defendant handled firearms in a safe manner.

About two weeks before Carolyn's death, defendant and his wife spent the day together and discussed reconciliation. Carolyn had a date for that evening, but tried to break it. When she could not reach her date, she drove to Goldsboro to tell him not to come to New Bern. Defendant telephoned her house every fifteen minutes until she returned around 12:30 a.m. The next morning, defendant came to the house about 7:00 a.m. Tracy Turnage testified at trial that she heard her mother's bedroom door slam shut and heard her mother scream. Tracy went into the bedroom and observed her father choking her mother. When she threatened to call the police, her father responded that the police could not come in time. Tracy then threatened to get her gun and told her parents that she was tired of them fighting. Defendant released Carolyn, apologized, and left the house.

The day before the shooting, Tracy spent the night with her father and her aunt, Sandra Hood, at Hood's trailer. While Tracy and defendant were watching a movie, defendant suddenly asked her what she would do if anything happened to him and her mother. When she joked that she would live with a friend, defendant responded that she could not do that. That evening, Tracy saw a handgun in a holster on the floor by the corner of the couch. Several weeks earlier, she had seen a handgun on her father's bed. On the morning of 17 November, Tracy got dressed and went to her mother's house. She and Carolyn fought over disciplinary measures, and Tracy became upset. Carolyn told Tracy that she

could stay home from school that morning. Carolyn then called defendant and asked him if he could repair their washing machine that morning while Tracy was at home. Carolyn instructed Tracy to call her at work if defendant took anything from the house. Defendant arrived at the house around 10:00 a.m. and repaired the washer. When he left, he took a collage of family pictures from the wall, saying that it was the only picture he had of his father. Tracy called and reported to her mother as requested. After defendant left the house, he went to the post office where he received a proposed separation agreement from Carolyn's attorney.

Carolyn Turnage asked to be excused from work for personal reasons at 10:30 a.m. Her boss testified that she had been crying, but was in control. Carolyn arrived at Sandra Hood's trailer around 11:00 a.m. That afternoon defendant gave this statement about the events that followed:

> I heard somebody knock at the door and my sister said it was Carolyn so I told her to let her in. She asked me could she talk to me in private. I said "Yeah, come on into my bedroom." We started arguing about her not keeping her word over the [separation] papers. She got mad and said she was going to take everything I had down to my last screw, my business, everything. My Dad's gun was laying on the bed and she said she was even going to take it, and grabbed it. I tried to grab it away from her and we stood up. About the same time I was trying to get the gun away from her she kicked me in the "nuts." She fell sideways when she kicked me and I fell backward and as I was falling backward I heard the gun go off. She was shot right beside the head. When I got up off the floor I ran over there and grabbed her. She was laying over there falling on my barbells, the bucket my phone is on and my bed. I hollered for my sister to call the ambulance, and then I tried to drag her to the truck to carry her to the emergency room. She was bleeding so bad. I run into the bathroom and grabbed a rag and put a compress on her head to try to stop the bleeding. I was hollering for my sister was the ambulance coming. She stopped breathing so I tried to give her a heart massage and mouth-to-mouth, but I didn't know what to do. I held the compress and I got telling her "Please don't die. Me and Tracy need you." I held the compress until the ambulance came.

Officers from the sheriff's department were met at the door of the trailer by Sandra Hood. She told them that her brother and his wife had been having trouble and his wife had been shot. They found defendant in the bedroom holding his wife's head. Defendant had blood around his mouth and on his hands. When emergency personnel arrived to transport Carolyn to the hospital, they discovered the gun under her body. Defendant gave a statement at the scene and signed the above written statement at the sheriff's office. He then agreed to participate in a re-enactment of the events surrounding the shooting. Crime Scene Investigator Terry Register played the part of Carolyn Turnage, with defendant telling her what to do. Defendant indicated that he and his wife sat at one end of the bed. The gun was nearby in a holster, partially covered by a white tee shirt. In demonstrating how his wife fell after being shot, he placed Register with her buttocks up against the windowsill and her head in the curtains. He did not at any time put her head against the barbells.

Defendant also demonstrated where he thought his arm was as the gun went off. He said that during the struggle, his wife had the holster and tee shirt end and he had the handle and trigger end of the gun. As he fell backwards, the gun was pointed up and to the right as it fired. Defendant thought that his arm hit a television set at the end of the bed as the gun went off. He then said he was unsure when the gun fired and did another demonstration. During the second demonstration, defendant stated that he was unsure if his arm hit the television. However, in both demonstrations, he held the gun up and to the right and placed Register against the sill and in the curtains. Defendant told the sheriff's investigator that he regularly kept loaded guns in the house with the safeties off.

Dr. Charles Garrett, the pathologist and medical examiner who performed the autopsy on Carolyn Turnage's body, testified that the gunshot wound to her head was clean with no powder residue, indicating that the gun was at least two feet away when fired. The bullet entered the left side of the head, entered the brain and travelled slightly forward from back to front and downward from left to right. A cut on her nose could have been caused by a fall on the barbells.

Michael Creasy, a forensic chemist for the State Bureau of Investigation, testified that the handwipings taken from Carolyn

**STATE v. TURNAGE**

[328 N.C. 524 (1991)]

Turnage revealed lead deposits, consistent with having been shot at rather than actually firing a gun, on the right palm, left palm, and the back of the left hand. There was no significant residue on the back of the right hand. He explained that the left hand would have been parallel to the muzzle of the gun and the right palm would have been turned toward the weapon. There was no residue on defendant's hands, but the test was done four hours after the shooting. Creasy testified that normal activities could remove residue. An SBI weapons expert tested the gun and determined that it would not fire with the safety on and did not misfire when struck against the floor or with a weight.

Physical evidence at the scene revealed bloodstains on the barbells, but no blood higher than the windowsill and no blood on the curtains. Other weapons found in the house were two shotguns, both of which were unloaded, and one rifle, which was loaded with the safety on. Defendant's answering machine tape was played in court, revealing an angry message from Carolyn regarding the picture defendant had taken from her house. Defendant had apparently not heard the message before the shooting. The State formulated the theory that Carolyn Turnage had been sitting down when she was shot and held her hands out in front of her in a defensive action. She fell off the bed, over the bucket with the phone on it, and onto the barbells.

Defendant put on evidence, but did not testify in his own behalf. His evidence tended to show the following. Defendant's brother testified that his father's handgun had once misfired while the safety was on, injuring his father in the leg. Sandra Hood corroborated defendant's account of Carolyn arriving at the trailer and asking to speak to the defendant in private. After the couple went into the bedroom, Hood went into the kitchen and heard nothing until the gun went off. As she headed toward the bedroom, defendant emerged and said, "Oh my God. I have killed my wife. It was an accident. Call an ambulance." In the bedroom, she heard defendant say, "Please don't die. I love you too much. I need you and Tracy needs you." Hood denied telling the sheriff that her brother and his wife were having trouble. She also testified that the handgun had fallen apart and defendant had it put back together before moving in with her. When asked about the choking incident, Hood related defendant's version of the story. He told her that Carolyn jumped on him during an argument and he threw her

on the bed and walked out. Tracy was watching and cursing at them both.

Thomas "Buzzy" Morris, defendant's best friend, testified that he had seen Carolyn physically attack defendant during arguments, but had never seen defendant strike her. He also testified that defendant kept loaded guns in his house. On cross, Morris testified that defendant admitted choking his wife during an argument. Defendant offered other character witnesses who testified as to his good reputation in the community.

Defendant also offered the testimony of an emergency room nurse, who testified that she had wiped the back of Carolyn Turnage's right hand with alcohol in order to start an I.V. On rebuttal, the State recalled Agent Creasy, who testified that wiping the victim's hand with alcohol would decrease the amount of lead particles, if there were any particles there. However, it was still his opinion that Carolyn's hands were in the path of the bullet when it was fired.

Defendant contends that the evidence is insufficient because the State's evidence is uncontradicted and exculpatory. We do not agree. Murder in the second degree is an unlawful killing with malice, but without premeditation and deliberation. *E.g., State v. Robbins*, 309 N.C. 771, 309 S.E.2d 188 (1983). The evidence is sufficient to uphold a second-degree murder conviction under the facts of this case unless this Court can hold as a matter of law that defendant's version of the events eliminated all inferences of intentional firing of the weapon. *See State v. Jones*, 287 N.C. 84, 214 S.E.2d 24 (1975). This appeal turns on this Court's analysis of defendant's contention that his exculpatory statements were uncontradicted.

In reviewing a motion to dismiss, the evidence must be considered in the light most favorable to the State, giving the State every reasonable inference that may be drawn therefrom. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). Evidence presented by the defendant that is favorable to the State must be considered, but defendant's evidence unfavorable to the State may not be considered. *Id.* Where defendant's favorable evidence is not contradictory, it may be used to clarify the State's evidence. *Id.* When the State introduces uncontradicted exculpatory evidence in its case-in-chief, the State is bound by those statements, and defendant is entitled to a dismissal of the charges. *State v. Bolin*, 281 N.C. 415, 189 S.E.2d 235 (1972); *see also State v. Meadlock*, 95 N.C.

App. 146, 381 S.E.2d 805, *disc. rev. denied*, 325 N.C. 434, 384 S.E.2d 544 (1989). However, the State may show "that the facts concerning the homicide were different from what the defendant said about them." *Bolin*, 281 N.C. at 425, 189 S.E.2d at 241-42.

In *State v. Bright*, 237 N.C. 475, 75 S.E.2d 407 (1953), the defendant was convicted of manslaughter in the shooting death of his wife. Defendant admitted that his finger was on the trigger of the gun, but claimed that it discharged accidentally while he struggled for the gun with his wife. The evidence showed that the bullet entered just below the victim's left breast, travelled downward, and came out below her right hip. There were no powder burns around the wound or on the victim's body or clothing. This Court upheld defendant's conviction, noting that if there is any substantial evidence to support the State's case, then it is for the jury to decide whether the State has proved defendant's guilt beyond a reasonable doubt. The majority of the Court of Appeals distinguished *Bright*, because defendant in the instant case did not admit to having his finger on the trigger. In so doing, the Court of Appeals majority erred. While defendant did not admit that his finger was on the trigger, he did state that he had hold of the handle and trigger end of the gun. Furthermore, that was only one factor that was involved in *Bright*. In *Bright* this Court based its decision on multiple factors, including the path of the bullet, the absence of powder burns, and the admission that the defendant and victim were struggling. In the instant case, there was even more circumstantial and physical evidence contradicting defendant's statements.

Defendant's re-enactment of the killing significantly contradicts his prior statements to the officers. He first stated that his wife fell on his barbells; there was blood on the barbells. In the re-enactment, defendant placed his wife with her buttocks against the windowsill and her head in the curtains; no blood was found in the curtains. Defendant performed the re-enactment twice. At no time did he place the victim's head at the barbells. In both re-enactments, defendant had the gun held up but his wife falling backwards against the windowsill and the curtains. Thus, the exculpatory evidence is contradictory in substantial detail as to what happened.

Taking the evidence in the light most favorable to the State, a jury could reasonably infer that there was hostility and a history

of violence between defendant and the victim. From defendant's question to his daughter about her future if something happened to him and her mother, the jury could infer an intent to commit murder and suicide. The only loaded weapon found on defendant's premises after the shooting had the safety on. The weapon involved in the killing was tested, the safety functioned properly, and the gun would not fire when struck against the floor or when a weight was dropped on it. Defendant was a hunter, was familiar with firearms, and handled them safely. The pathologist testified that when the firearm was discharged, it was at least two feet from the victim's head. From this evidence and that of the path of the bullet, the absence of powder burns, and the presence of gunshot residue on the victim's hands, the jury could reasonably infer that defendant intentionally fired the weapon while he was standing and that the victim's hands were in a position parallel to the path of the bullet and not on the gun when it was fired. The physical evidence contradicts defendant's claim of an accident because it indicates that defendant was standing with the gun pointed downward, and that Carolyn turned her head away from defendant and held her hands in front of her in a defensive manner. The location of the blood on the barbells contradicted defendant's re-enactment of the shooting. Moreover, defendant admitted that he had the trigger end of the gun and stated after the shooting, "I have killed my wife."

We hold that the State's evidence sufficiently contradicted defendant's claim of accident and the denial of the motion to dismiss was proper. The decision of the Court of Appeals is

Reversed.