STATE OF NORTH CAROLINA v. TONY ALLEN WALKER

No. 163A91

(Filed 19 November 1992)

**1. Homicide § 200 (NCI4th)— first degree murder—possible suicide—sufficiency of evidence**

The trial court properly denied defendant's motions to dismiss a charge of first degree murder for insufficient evidence where the evidence suggested two possibilities: that the victim was either shot by her lover in cold blood or that she took her own life in his presence. Setting aside defendant's evidence

---

and taking the facts established at trial by the State in the light most favorable to the prosecution, the facts constitute substantial evidence of defendant's guilt.

**Am Jur 2d, Homicide § 297.**

**Admissibility, in homicide prosecution, of opinion evidence that death was or was not self-inflicted. 56 ALR2d 1447.**

2. **Homicide § 245 (NCI4th)— murder—possible suicide— premeditation or deliberation—circumstantial evidence sufficient**

The circumstantial evidence of premeditation and deliberation was sufficient to submit a first degree murder case to the jury where defendant contended that the victim committed suicide in her lover's presence, that there was no direct evidence of premeditation or deliberation, and that the circumstantial evidence in no way shows premeditation or deliberation. However, witnesses for the State testified that defendant had physically abused the victim on occasions prior to her death while defendant denied ever striking the victim; the State's evidence tended to show that up to an hour elapsed before defendant dialed 911 for assistance after the shooting occurred, contrary to defendant's claim that he reported the shooting immediately; and the nature of the killing indicates a premeditated and deliberate act of homicide. These facts, among others, support a reasonable inference that there was a conflict between defendant and the victim prior to her death; that he mercilessly waited for an hour after the shooting before seeking medical care for the victim; and that defendant was avoiding the truth in his rendition of the facts.

**Am Jur 2d, Homicide §§ 438-440.**

**Modern status of the rules requiring malice aforethought, deliberation or premeditation, as elements of murder in the first degree. 18 ALR4th 961.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435, supp. sec. 1.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656, supp. sec. 1.**

STATE v. WALKER

[332 N.C. 520 (1992)]

3. **Evidence and Witnesses § 875 (NCI4th) — murder — statements of victim — prior assaults by defendant — state of mind exception**

The trial court did not err by admitting in a murder prosecution hearsay statements by the victim concerning defendant's prior physical assaults against her because the challenged testimony was indicative of the declarant's state of mind. The victim's state of mind was relevant to the question of whether she was murdered or committed suicide. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence §§ 650, 652.**

4. **Criminal Law § 838 (NCI4th); Homicide § 407 (NCI4th) — murder — defendant's false, contradictory or conflicting statements — instructions**

The trial court did not err in a murder prosecution by giving an instruction on false, contradictory or conflicting statements where the jury was not left to roam at will in search of contradictions to use against defendant and the instruction made it clear to the jury that evidence of falsehood is never sufficient to establish guilt standing alone, does not create a presumption of guilt, and may not be considered as tending to show premeditation or deliberation. This instruction is proper not only where defendant's statements contradict each other but also where defendant's own statements flatly contradict the relevant evidence; here the inconsistencies brought to light by the comparison between certain statements of defendant and the evidence at trial were not completely irrelevant and had substantial probative force, tending to show consciousness of guilt.

**Am Jur 2d, Trial § 415; Witnesses § 1045.**

**Modern view as to propriety and correctness of instructions referable to maxim "falsus in uno, falsus in omnibus." 4 ALR2d 1077.**

5. **Constitutional Law § 226 (NCI4th) — mistrial — failure to comply with discovery — no prosecutorial misconduct — retrial not a double jeopardy violation**

There was no double jeopardy violation in the second trial of a murder defendant following a mistrial for the State's failure to comply with discovery where the first trial court found that there had been a breakdown in communication but

STATE v. WALKER

[332 N.C. 520 (1992)]

no prosecutorial misconduct and the defense attorneys did not object after being invited to do so. Given that finding, and an absence of anything in the record to imply that it was erroneous, there is no basis for the assertion that the mistrial was the result of prosecutorial misconduct, and thus the secondary question of whether the misconduct was intended to provoke a mistrial does not arise.

**Am Jur 2d, Criminal Law §§ 285, 286.**

**Double jeopardy as bar to retrial after grant of defendant's motion for mistrial. 98 ALR3d 997.**

**Former jeopardy as bar to retrial of criminal defendant after original trial court's sua sponte declaration of a mistrial — state cases. 40 ALR4th 741, sec. 1.**

**6. Criminal Law § 518 (NCI4th) — murder — failure to provide discovery — no prejudice to defendant — no mistrial**

The trial court did not abuse its discretion by denying a murder defendant a mistrial based upon the State's failure to provide discovery material regarding two separate tests performed by the State's investigators where one test was inconclusive and provided little in the way of damaging testimony for either the State or defendant, and any advantage which may have been gained for defendant through greater exposition of the second could have been countered by the State.

**Am Jur 2d, Criminal Law §§ 286, 770.**

**7. Criminal Law § 518 (NCI4th) — murder — failure of State to provide evidence — no prejudice — mistrial denied**

The trial court did not err in a murder prosecution by denying defendant's motion for a mistrial based upon the State's failure to make defense counsel aware of an SBI finding that the belt buckle worn by defendant on the night of the murder had two small drops of blood on it. The trial court found that the prosecutor was not aware of the existence of the blood on the belt buckle until the investigator testified at trial, that defense counsel had access to the investigator, and that defense counsel possessed a copy of his report. The existence of blood on defendant's belt buckle added little to the previous evidence, was inconsequential standing alone, and defendant was not substantially and irreparably prejudiced by being denied the information prior to trial.

STATE v. WALKER

[332 N.C. 520 (1992)]

**Am Jur 2d, Criminal Law §§ 286, 770; Depositions and Discovery §§ 420-428, 447-449.**

**Right of accused in state courts to have expert inspect, examine or test physical evidence in possession of prosecution — modern cases. 27 ALR4th 1188, sec. 1.**

Justice WEBB dissenting.

Chief Justice EXUM and Justice FRYE join in this dissenting opinion.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Greeson, J., at the 8 October 1990 Criminal Session of Superior Court, Guilford County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court on 13 April 1992.

*Lacy H. Thornburg, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 17 July 1989 for the first-degree murder of his girlfriend, Mary Sue Whitaker. He was tried non-capitally during the 7 May 1990 Criminal Session of Superior Court, Guilford County.

In the course of the trial, during presentation of testimony, defendant moved for a mistrial, and upon a hearing, the trial court declared a mistrial. The State's chief investigator and assistant district attorney advised defense counsel prior to trial that no test other than a visual inspection had been performed on the weapon from which the fatal shot was fired. However, the police department's evidence specialist testified for the State that the weapon had been tested for fingerprints and that the test result was negative. The court found defendant was prejudiced and declared a mistrial by order dated 10 May 1990. The court further specifically found as a fact no intentional failure of the prosecution to comply with discovery and concluded as a matter of law that there had been no prosecutorial misconduct.

Retrial of defendant began at the 8 October 1990 session of Superior Court, Guilford County, with Judge Greeson again presiding. Again, during the trial defendant moved for a mistrial upon learning through testimony that a trace metal test had been performed on defendant's hand which was negative and that a test for blood had been conducted on defendant's belt buckle, showing two small drops of blood. The court found no prejudice to defendant and no prosecutorial misconduct and denied the motion. On 17 October 1990 the jury returned a verdict of guilty of first-degree murder. Defendant was sentenced to imprisonment for life, and gave notice of direct appeal to this Court.

The evidence showed that the victim, a waitress, and defendant, who worked for a garage door company, had been romantically involved since the previous summer. Defendant's wife was aware of the relationship between them. In January and February 1989, the victim began asking defendant to choose between her and his wife, and the couple discussed living together on a trial basis. On the evening of the shooting, the victim and defendant had checked into a Motel 6 to spend the night and discuss their relationship. According to defendant, after some discussion, defendant told the victim he had decided to leave her and go back to his wife. Subsequently, Mary Sue Whitaker was shot with defendant's .38 caliber handgun and died from her wounds.

The evidence further showed that Officer Sandra Jenkins of the Greensboro Police Department responded to a radio call placed at 9:45 p.m. on Friday, 10 February 1989 concerning a shooting and injury in Room 229 of the Motel 6 on Greenhaven Drive in Greensboro. Upon her arrival at the motel, Officer Jenkins saw defendant standing on the balcony in front of Room 229. As she approached, defendant said, "She's dead. She shot herself." Officer Jenkins asked what happened and defendant told her he and his girlfriend had gotten into an argument and she had picked up his gun and shot herself. On entering the room, Officer Jenkins saw the victim lying on her stomach with her left arm stretched out, the right side of her head up, and her face covered with blood. A large puddle of blood was beside the victim's head. A .38 caliber gun was on the floor at the right side of the victim, near her feet. The victim was still breathing and Officer Jenkins requested that EMS "rush it up." The Guilford County EMS had been called at 9:44 p.m. Emergency paramedic Joe Powell testified that he arrived at the motel at 9:52 p.m. and found Whitaker

STATE v. WALKER

[332 N.C. 520 (1992)]

breathing with difficulty. He administered CPR and took Whitaker to a hospital shortly thereafter.

Officer Frank Noah arrived at 10:02 p.m. and made note of the following items in the motel room: two cups and a liquor bottle on a bedside shelf, a receipt from an ABC store in Greensboro dated 10 February at 8:27 p.m., and a gun holster on a chair near the door. Greensboro Police Detective Ed Hill testified that he saw a holster in a chair and observed it was snapped shut. He further testified that defendant related the following sequence to him during the course of defendant's statement made at the police station:

> He told the victim he was going back to his wife; they conclud-ed they would be friends; he sat down on the bed and heard a click; he saw the gun in her hand with the barrel to the right side of her head; she pulled the trigger and he could not stop her.

Later, when defendant undressed at the police station, a large amount of blood was observed on his socks and inside his boots. There was no blood on the outside of his boots, or elsewhere on the outside of his clothing.

One spent casing and four live rounds were collected from the gun, which belonged to defendant and had the capacity to hold five rounds. There were rubber grips which covered the handle of the gun. These serve to stabilize the weapon in the hand, but make it difficult to pick up identifiable fingerprints. The gun was tested for latent fingerprints but insufficient detail was found to make any identification. A trace metal test on 11 February to determine whether defendant had recently held a metal object also proved negative, although trace elements of a gun cartridge were detected on him.

The testimony of State's witnesses Charles McCoy and Samuel Kimbrough placed the time of the shooting at between 8:00 and 9:00 p.m. McCoy testified that on 10 February 1989, he was staying in a room on the first floor of the Motel 6 on Interstate 85. He got to his room at the motel at approximately 7:00 p.m. and he began to watch television. While he was watching "Father Dowling Mysteries," which aired from 8:00 to 9:00 p.m., there was a disturb-ing noise coming from the room directly above him, as if people were fighting or throwing furniture around. The noise went on

**STATE v. WALKER**

[332 N.C. 520 (1992)]

for about fifteen or twenty minutes. He ascertained the room number from which the noise came. He then called the desk clerk and asked him to call the people in Room 229 and tell them to be quiet. McCoy testified that just before he called the front desk he heard a noise that sounded like someone "had picked the bed up and dropped it on the ceiling." After he called the front desk, it became very quiet upstairs, except for what sounded like someone pacing back and forth the length of the room. McCoy stated that the disturbance had continued up until the time he heard the very loud noise.

Samuel Michael Kimbrough testified that on 10 February 1989 he was working as a desk clerk at the Motel 6 on Greenhaven Road. He arrived at work at 8:30 p.m. Almost immediately after his arrival, he received a phone call from a man who said that he could not hear his television, because "somebody [was] throwing something around, [and there was] a big disturbance in the room up above [him]" and asked Kimbrough to call Room 229. Kimbrough made the call and a man answered the phone. The desk clerk told him that he had received a complaint that the persons in Room 229 were making too much noise, and the man who answered said that "[he would] take care of it" and hung up the phone.

Jan Bruner, defendant's sister-in-law, testified that defendant called her by telephone between 9:30 and 10:00 p.m. on the evening of 10 February 1989 and asked if his wife, Cathy, was there. After being told his wife was not with Bruner, defendant asked Bruner to find his wife and informed Bruner that he might be charged with murder.

There was considerable disagreement among the several physicians who gave testimony as to the probability of Ms. Whitaker's surviving for as much as an hour after the shooting. Dr. Deborah L. Radisch, associate chief medical examiner of the State of North Carolina, who performed the autopsy, opined that Ms. Whitaker would most likely have lived only five to ten minutes after infliction of the wound, but could not rule out the possibility of her surviving for up to an hour. Dr. George Podgorny of Moses H. Cone Memorial Hospital testified that patients with such wounds to their frontal brain lobes often survive for well over an hour. Dr. Page Hudson, professor of pathology at the East Carolina University School of Medicine, testified that pneumonia would set in within an hour

or two of a shooting such as that suffered by the victim; however, the autopsy revealed no pneumonia in the victim's lungs.

An autopsy of the victim revealed that she died from a contact gunshot wound to her right temple. The presence of an area of abrasion, an area of scorching, and gunpowder in the wound indicated that at the moment the gun was fired, its muzzle was in contact with the victim's skin. The force of the shot under such circumstances typically causes the scalp around the entrance hole to be blown back and torn, a result which was found here. It is also typical for tissue or blood to be blown back into the muzzle of the gun, but police detectives found an absolute lack of any blood or tissue on or inside the weapon, and concluded that the weapon had probably been wiped clean. The autopsy further indicated that the blood alcohol content of the victim was equivalent to a .17 on the breathalyzer scale.

Several of the State's witnesses testified to defendant's previous physical abuse of the victim. An employee of Terry's Curb Market testified that on 5 February 1989, the Sunday before the shooting, he saw defendant outside the market arguing with the victim and choking her. He called the sheriff's department; deputies confirmed at trial that they came and intervened and the couple left in separate vehicles.

A friend of the victim's, Carl Sidney Amos, testified over defendant's objection, on hearsay grounds, that one time he observed a cut under the victim's nostril, which was swollen. When he asked the victim about it she said defendant had shoved her into a door. This episode was corroborated by testimony from the victim's sister-in-law, Bonnie Whitaker. Amos also said he had questioned the victim about some small marks on her face and bruises on her arm. She had confided that defendant had hit her on one occasion and grabbed and shaken her on another, causing those injuries. Another friend, Clyde W. Billings, whom the victim had previously dated, testified that Mary Sue Whitaker had told him she wished defendant would leave her alone. Billings testified to seeing bruises on the victim, asking her about them, and having her reply that defendant had grabbed and kicked her. Bonnie Whitaker further testified that she had seen bruises on the victim; Mary Sue explained these by saying defendant had "grabbed" her and held on "real tight." On the evening of 10 February, hours before her death, Bonnie overheard the victim on the telephone telling defend-

ant that he would have to choose between her and his wife. Bonnie also observed that the victim's arm had no bruise on it at that time; when she saw her sister-in-law's body at the funeral home, Bonnie Whitaker saw a new bruise on Mary Sue Whitaker's arm.

David Lee McKinney testified that defendant and the victim had lived with him for approximately three weeks. One night when McKinney came home he saw the victim holding a gun to her head, threatening to kill herself. Defendant was pleading with her to put the gun down, which she finally did. McKinney testified that the victim did not want defendant to leave her. Another friend of the victim's, Linda Locklear, told the court that in early February 1989 the victim had cried to her and told her she would kill herself before she would live without defendant.

Medical records were admitted which showed that the victim had been diagnosed as "chronically dysfunctional," with "depressive neurosis," "suicide ideation" and depression. A psychologist testified that Mary Sue Whitaker suffered from a "borderline personality disorder" and presented a high risk of suicide, having seen her stepfather commit suicide by shooting himself when she was fourteen years old, after she had reported to her mother his physical and sexual abuse of her.

I.

[1] Defendant first contends his conviction must be vacated because there was insufficient evidence that he killed the victim and that *all* the evidence established that she committed suicide. Defendant moved to dismiss the charge of first-degree murder both at the end of the State's case-in-chief and again at the close of all the evidence on these grounds. We conclude that both motions were properly denied.

While we disagree with defendant's assessment of the evidence, he correctly sets forth in his brief, from a defense perspective, the parameters of consideration by a trial court on motions to dismiss for insufficiency of the evidence. This Court has held:

> To warrant a conviction on circumstantial evidence, the facts and circumstances must be sufficient to constitute *substantial* evidence of every essential element of the crime charged. Guilt must be a legitimate inference from facts established by the evidence. When the facts and circumstances warranted by the evidence do no more than raise a suspicion of guilt,

they are insufficient to make out a case and a motion to dismiss should be allowed.

*State v. Daniels*, 300 N.C. 105, 114, 265 S.E.2d 217, 222 (1980) (emphasis added) (citation omitted) (quoting *State v. Blizzard*, 280 N.C. 11, 16, 184 S.E.2d 851, 854 (1971)). In this regard, our law provides that the trial court's duty in ruling upon a criminal defendant's motion to dismiss is limited to the function of determining "whether a reasonable inference of the defendant's guilt . . . *may* be drawn from the evidence. If the trial court determines that a *reasonable* inference of the defendant's guilt *may* be drawn from the evidence, it must deny the defendant's motion and send the case to the jury even though the evidence may also support reasonable inferences of the defendant's innocence." *State v. Smith*, 40 N.C. App. 72, 78-79, 252 S.E.2d 535, 539-40 (1979), *citing State v. Thomas*, 296 N.C. 236, 250 S.E.2d 204 (1978). This Court has also held that the substantial evidence required to be shown as to each element is "that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981).

In addressing the issue of the sufficiency of the evidence we are therefore compelled to ask whether the facts support a reasonable or legitimate inference of guilt, which must be based on substantial evidence of every element and raise more than a mere suspicion of guilt, but which need not necessarily exclude the possibility of innocence. The instant case indeed falls within the narrow corridors of this standard, notwithstanding the haunting questions raised by the victim's suicidal tendencies and the inference of suicide. Our analysis of the evidence before the trial court is made easier by three legal principles: (1) the evidence is to be considered in the light most favorable to the State, which is entitled to every reasonable inference which may be drawn from it, *State v. Robbins*, 309 N.C. 771, 309 S.E.2d 188 (1983); (2) defendant's evidence rebutting the inference of guilt is not to be considered except to the extent that it explains, clarifies or is not inconsistent with the State's evidence, *State v. Furr*, 292 N.C. 711, 235 S.E.2d 193, *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977); and (3) in considering a motion to dismiss, the trial court is concerned "only with the sufficiency of the evidence to carry the case to the jury . . . not . . . with the weight of the evidence." *State v. Gonzalez*, 311 N.C. 80, 85, 316 S.E.2d 229, 232 (1984).

STATE v. WALKER

[332 N.C. 520 (1992)]

The facts of this case suggest two diametrically opposite, but equally tragic, possibilities: Mary Sue Whitaker was either shot by her lover in cold blood or she took her own life in his presence. Defendant contends that all the undisputed evidence shows that the victim committed suicide. She had a documented history of presenting a risk of suicide; she had previously threatened suicide with the same gun used in her death; and scarcely a week earlier she had said she "would kill herself before she would live without defendant." However, leaving defendant's evidence aside and taking the facts established at trial by the State in the light most favorable to the prosecution, the facts constitute substantial evidence of defendant's guilt. The timing of the shooting between 8:30 and 9:00 p.m. was established by two witnesses, Samuel Kimbrough, the desk clerk and Charles McCoy, the occupant of the room directly below Room 229. McCoy heard loud noises coming from the room during that period, then a very loud sound and then silence, except for the pacing of one individual. Kimbrough testified that he arrived at work at 8:30 p.m. and placed the call to Room 229 almost immediately thereafter. Even defendant asserted that the desk clerk's call came just at the time of the shooting. Yet emergency personnel were not contacted until 9:44 p.m. When the clerk called, defendant did not take the opportunity to ask for assistance; his only response to the clerk's request was "okay." One may infer that defendant did not seek help for the victim for approximately an hour after the shooting, an inference consistent with his guilt.

Although the lethal wound to the victim was indisputably a contact wound, the weapon bore no trace of blood or flesh and appeared to the police to have been wiped clean. Tests on the hands of both parties for firearm residue were inconclusive, but traces of elements which make up the primer composition of a cartridge were found on defendant's hands, which is inconsistent with his assertion that he was several feet away from the weapon when it was fired. Another inconsistency appeared in defendant's statement that he held the victim in his arms after she shot herself, an assertion at odds with the fact that while she was bleeding profusely he had no blood on the outside of his clothes. Officer Hill found the gun holster snapped shut which would be inconsistent with the victim suddenly grabbing a gun and shooting herself. Defendant's lack of candor about his previous physical assaults on the victim further implicates his story concerning these events.

Defendant's dispassionate and self-interested behavior in passing up the chance to get help from the desk clerk, waiting to report the shooting, and, in a telephone call to his wife, between 9:30 and 10:00 p.m., expressing concern not with Whitaker's death but with the possibility that he might be charged with murder, all add to the composite picture of guilt. We therefore conclude that the State adduced sufficient evidence at trial to establish a reasonable inference of defendant's guilt and we uphold the trial court's denial of his motions to dismiss the charge. Our decision on this issue is supported by our decisions and the rationales given for them in *State v. Turnage*, 328 N.C. 524, 402 S.E.2d 568 (1991); *State v. Hankerson*, 288 N.C. 632, 220 S.E.2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233, 53 L. Ed. 2d 306 (1977); and *State v. Bright*, 237 N.C. 475, 75 S.E.2d 407 (1953).

II.

[2]    Defendant next argues that there was insufficient evidence of premeditation and deliberation to submit the charge of first-degree murder to the jury. First, defendant asserts that there was no direct evidence of premeditation or deliberation. This Court has often stated that "[p]remeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence." *State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 823 (1985), *rev'd on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Consequently, a complete lack of direct evidence showing premeditation and deliberation does not in and of itself lead to the conclusion that there was insufficient evidence of these elements of first-degree murder to allow submission of this charge to the jury.

Defendant contends secondly that the circumstantial evidence in no way shows premeditation or deliberation on his part. As with the sufficiency issue discussed above, in order for the court to properly find sufficient evidence of premeditation and deliberation, it is not necessary that the evidence require a guilty verdict but only that the circumstantial evidence on premeditation and deliberation support a reasonable inference of the existence of these factors.

If the evidence presented is circumstantial, 'the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for

the jury to decide whether the facts, *taken singularly or in combination*, satisfy them beyond a reasonable doubt that the defendant is actually guilty.'

*State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (citation omitted). "Substantial evidence must be existing and real but need not exclude every reasonable hypothesis of innocence." *Brown*, 315 N.C. at 58, 337 S.E.2d at 822.

The State's evidence was generally in conflict with that presented by defendant. When considering a motion to dismiss, the court "must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and inference to be drawn therefrom. . . . Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal." *Id.* "If the evidence adduced at trial gives rise to a reasonable inference of guilt, it is for the members of the jury to decide whether the facts shown satisfy them beyond a reasonable doubt of defendant's guilt." *State v. Jones*, 303 N.C. 500, 504, 279 S.E.2d 835, 838 (1981).

"Premeditation is defined as thought beforehand for some length of time; deliberation means an intention to kill, executed by defendant in a 'cool state of blood' in furtherance of a fixed design or to accomplish some unlawful purpose." *Id.* at 505, 279 S.E.2d at 838. This Court has stated that "[s]ome of the circumstances which give rise to an inference of premeditation and deliberation are ill will or previous difficulty between the parties, . . . [and] the conduct of defendant before and after the killing . . . ." *Id.* at 505, 279 S.E.2d at 839 (citations omitted). Witnesses for the State testified that defendant had physically abused the victim on occasions prior to her death. Defendant denied having ever struck the victim. Contrary to defendant's claim that he reported the shooting immediately, the State's evidence tended to show that up to an hour elapsed before defendant dialed 911 for assistance after the shooting occurred. Moreover, the nature of the killing, a contact shot to the temple, indicates a premeditated and deliberate act of homicide, if the State's theory that defendant was holding the weapon in such a position against the victim's head is to be believed. These facts, among others, support a reasonable inference that there was a conflict between defendant and the victim prior to her death; that he mercilessly waited for an hour after the

shooting before seeking medical care for the victim; and that defendant was avoiding the truth in his rendition of the facts.

Thus, giving the State every reasonable inference from the evidence presented, the circumstantial evidence on premeditation and deliberation was sufficient to submit the case to the jury. It was for the jury to resolve the conflicts in the evidence in its capacity as the trier of fact. No error was committed in denying defendant's motion to dismiss for lack of sufficient evidence of premeditation and deliberation.

## III.

[3] Defendant next assigns as error the trial court's admission into evidence of certain hearsay statements concerning defendant's prior physical assaults on the victim. These statements, along with at least one eyewitness account, were introduced by the State through friends and family of the victim who repeated statements made by the victim to them indicating that defendant had hit, grabbed, kicked, shaken and shoved her, causing the injuries they observed. Defendant contends this evidence was hearsay, not within any exception to the rule against hearsay evidence, and prejudicial to him.

We agree with defendant that the statements in question were hearsay. We further find that the trial court erroneously allowed the statements into evidence as being the victim's statement relating to her existing physical condition, as opposed to her then existing state of mind. N.C.G.S. § 8C-1, Rule 803(3) (1988). However, the statements were admissible under N.C.G.S. § 8C-1, Rule 803(3), the state-of-mind exception to the hearsay rule. The rule states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind . . . (such as intent, plan, motive, design . . .), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

N.C.G.S. § 8C-1, Rule 803(3).

**STATE v. WALKER**

[332 N.C. 520 (1992)]

In recent years this Court has defined the state of mind exception to include statements made by the victim which may indicate the victim's mental condition by showing the victim's fears, feelings, impressions or experiences. *State v. Holder*, 331 N.C. 462, 418 S.E.2d 197 (1992); *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991); *State v. Meekins*, 326 N.C. 689, 392 S.E.2d 346 (1990); *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990). "Evidence tending to show the state of mind of the victim is admissible as long as the declarant's state of mind is relevant to the case," *State v. Meekins*, 326 N.C. at 695, 392 S.E.2d at 349, and "the possible prejudicial effect of the evidence does not outweigh its probative value." *State v. Cummings*, 326 N.C. at 313, 389 S.E.2d at 74 (quoting *Griffin v. Griffin*, 81 N.C. App. 665, 669, 344 S.E.2d 828, 831 (1986) ).

In the *Holder* case, for example, we held testimony concerning statements made by the victim prior to her murder could all be allowed into evidence under Rule 803(3). The testimony consisted of evidence that the victim had seen a small handgun in defendant's pocket, that defendant had threatened her with physical harm, and that defendant had refused to leave her alone after she had tried to end the relationship. The testimony tended to show "the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder." *Holder*, 331 N.C. at 485, 418 S.E.2d at 210. The statements at issue in the present case were admitted for the same purpose. Moreover, as in *Holder*, the probative value of the evidence outweighed any potential prejudice to defendant.

In *Cummings* this Court upheld the admission of statements by the victim to a community service organization's paralegal that defendant had beaten the victim on several occasions in the past, and threatened to kill her if she tried to take back her children from him. These statements were held to be admissible under the state of mind exception to the hearsay rule as they related directly to the declarant's state of mind and emotional condition. Moreover, the Court in *Cummings* also admitted into evidence certain statements made by the victim to her mother to the effect that the victim had taken out a child support warrant against defendant and sought an attorney's advice about obtaining custody of her and defendant's children. The Court found this evidence, though less explicitly descriptive of her mental condition, relevant to the victim's state of mind, specifically her likely inclination not to leave the children with defendant. Similarly, in the case *sub judice*, the

statements about prior abuse of the victim by defendant are highly relevant, although not determinative in any clear way, to the victim's state of mind at the time of the killing. In this case, the victim's state of mind is obviously extremely relevant to the question of whether the victim was murdered or committed suicide.

Finally, in *Stager*, this Court permitted the jury to hear an audiotape of the victim relating his thoughts and descriptions of certain actions by defendant because it showed the victim's fears and suspicions and tended to disprove the normal, loving relationship between them that defendant contended existed. In the case *sub judice* the victim's explanation of the origin of her cuts and bruises likewise tended to disprove the nonabusive relationship defendant described.

We find the challenged evidence indicative of the declarant's state of mind as defined by our jurisprudence, and we thus conclude there was no error in its admission into evidence.

## IV.

[4] Defendant next contends that the trial court erred in instructing the jury that if it found defendant made false, contradictory, or conflicting statements, the same could be considered as a circumstance tending to reflect the mental process of a person possessed of a guilty conscience. The trial court gave the following instruction:

> The State contends and the defendant denies that the defendant made false, contradictory or conflicting statements to the investigating officers in this case. If you find that the defendant made such statements, they may be considered by you as a circumstance tending to reflect the mental process of a person possessed of a guilty conscience, seeking to divert suspicion or to exculpate himself. If you find that the defendant made such statements, you should consider that evidence, along with all the other believable evidence in this case. However, if you find that the defendant made such statements, they do not create a presumption of guilt, and such evidence standing alone is not sufficient to establish guilt. I further charge that such evidence may not be considered as tending to show premeditation and deliberation.

Defendant contends that he made no false or contradictory statements, that if he did make any such statements, they were

on immaterial points, and that the instruction therefore allowed the jury to "roam at will" in search of contradictions to use against him. As noted above, this position is without merit.

This challenged instruction to the jury is an accurate paraphrase of decisions of this Court. "It is established by our decisions that false, contradictory or conflicting statements made by an accused concerning the commission of a crime may be considered as a circumstance tending to reflect the mental processes of 'a person possessed of a guilty conscience seeking to divert suspicion and to exculpate [himself].' " *State v. Myers*, 309 N.C. 78, 86, 305 S.E.2d 506, 511 (1983), *citing State v. Redfern*, 246 N.C. 293, 297-298, 98 S.E.2d 322, 326 (1957). In *Myers* this Court likened evidence of falsehoods to evidence of flight as a circumstance tending to show consciousness of guilt. The Court then applied three rules of law governing flight evidence to falsehood evidence as well. In effect, the Court held that evidence of falsehood may be considered with other facts and circumstances in determining guilt, but that (1) it is never, standing alone, sufficient to establish guilt; (2) it does not create a presumption of guilt; and (3) it may not be considered as tending to show premeditation or deliberation. *Myers*, 309 N.C. 78, 305 S.E.2d 506. The instruction given in the instant case made all three of these principles clear to the jury. Thus, the jury was not left to "roam at will" as was the case in *Myers* before these limitations were enunciated by the Court.

There were a number of areas where defendant's statements to the police or his testimony were contradictory to highly relevant facts proven at trial. For instance, defendant stated that he embraced the victim just after the shooting, but little or no blood was found on the outside of his clothing. Also, defendant stated that he had been sitting on the bed four or five feet away from the victim when she shot herself, but there were traces of cartridge residue on his hands and expert testimony that such residue was not consistent with his having been at such a distance from the blast.

The heart of defendant's argument is that the trial judge should not instruct on false, contradictory or conflicting statements if the statements under scrutiny are, as he contends these were, "completely irrelevant" and without "substantial probative force, tending to show consciousness of guilt." *See State v. Myers*, 309 N.C. at 87-88, 305 S.E.2d at 511-512. We agree with defendant's reading of the *Myers* case for this rule. However, we also agree with the

STATE v. WALKER

[332 N.C. 520 (1992)]

State that the challenged instruction is proper not only where defendant's own statements contradict each other but also where defendant's statements flatly contradict the relevant evidence. *Id.; State v. Yearwood*, 178 N.C. 813, 101 S.E. 513 (1919). We hold that the inconsistencies brought to light by this comparison between certain statements of defendant and the evidence at trial were not "completely irrelevant" and in fact had "substantial probative force, tending to show consciousness of guilt." Therefore, the trial judge did not err in giving the instruction on false, contradictory or conflicting statements.

V.

[5] In defendant's next assignment of error, he argues that the mistrial which occurred the first time this case was tried was the result of "flagrant prosecutorial misconduct" intended to provoke defendant's motion for a mistrial. Defendant contends that, due to this provocative misconduct, the retrial violated the double jeopardy principles of both the North Carolina and United States Constitutions.

"Article I, Section 19 of the North Carolina Constitution, the 'law of the land' clause, prohibits reprosecution for the same offense." *State v. White*, 322 N.C. 506, 510, 369 S.E.2d 813, 815 (1988). In determining whether a case may be retried after a defendant's successful motion for a mistrial, this Court in *White* accepted as the appropriate standard under our State Constitution the standard set forth by the majority in *Oregon v. Kennedy*, 456 U.S. 667, 72 L. Ed. 2d 416 (1982). As stated in *White*:

> If a defendant moves for a mistrial, he or she normally should be held to have waived the right not to be tried a second time for the same offense. Where the defendant makes such a motion because of prosecutorial misconduct, and the court grants the motion, retrial is not barred by Article I, Section 19 unless the *defendant shows* that the prosecutor was motivated by the intent to provoke a mistrial instead of merely the intent to prejudice the defendant.

*White*, 322 N.C. at 511, 369 S.E.2d at 815 (emphasis added).

On application of this test to the facts of the instant case it is clear that defendant's position and assertions on this assignment of error are without merit. The trial court, when granting the motion for a mistrial in the first case, stated:

**STATE v. WALKER**

[332 N.C. 520 (1992)]

There is not a scintilla of evidence to indicate that anybody on behalf of the State has deliberately misled anyone representing the defendant.

This court finds that there has been no misconduct on the part of the State of North Carolina, its assistant district attorney, its chief investigating officer, or Special Investigator Noah, but that there was a breakdown in communication . . . .

. . . .

. . . But I want to make sure that the order is replete that this court finds as a matter of law that this mistrial is declared not due to any misconduct on behalf of the State of North Carolina, and this case is not prohibited from being retried due to the misconduct by the State. This court finds as a fact that there was no misconduct by the State.

After this statement the court asked the defense attorneys if they objected to these findings to which they replied that they did not, and added that neither of them contended that defendant had been misled by the detective.

Given the above finding by the trial court, entered without objection, and an absence in the record of anything that would imply that the finding was erroneous, there is no basis for defendant's assertion that the mistrial which occurred in the first trial was the result of prosecutorial misconduct. Since defendant has failed to show misconduct on behalf of the State, the secondary question of whether the misconduct was motivated by the intent to provoke a mistrial does not arise. Thus, the constitutional standard set forth in *White* to establish that a retrial has effected a double jeopardy prosecution, has not been met. Therefore, as to this assignment, we find no error.

VI.

[6] Defendant's final assignment of error concerns the trial court's denial of his motion for mistrial in his second trial based upon the State's failure to provide discovery material regarding two separate tests performed by the State's investigators. As stated under our appropriate statutory law: "The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, . . . resulting in substantial and irreparable prejudice to the defendant's case."

N.C.G.S. § 15A-1061 (1988). In a criminal case where the defendant is not subject to capital punishment, "ruling on a motion for mistrial . . . rests largely in the discretion of the trial court." *State v. McCraw*, 300 N.C. 610, 620, 268 S.E.2d 173, 179 (1980), *citing State v. Battle*, 267 N.C. 513, 148 S.E.2d 599 (1966). "The scope of appellate review, then, is limited to whether in denying the motions for a mistrial, there has been an abuse of judicial discretion." *State v. Boyd*, 321 N.C. 574, 579, 364 S.E.2d 118, 120 (1988).

Defendant directs our attention to two instances where he claims there was sufficient prejudice to constitute an abuse of discretion by the trial court in denying his motion for mistrial. First, he points to the fact that defense counsel was not made aware prior to trial of the trace metal test performed on defendant's hands on the night of the victim's death. Defendant argues that he could have gained greater exculpatory value from this information had he known it sooner. In our view, the finding regarding the trace metal test was inconclusive and provided little in the way of damaging testimony for either the State or defendant. The results of the test did not indicate that defendant had recently held a metal object. Witnesses also indicated that there was a rubber or heavy plastic "Pachmayr" grip on the weapon which could have prevented the test from returning a positive reading. Any advantage which may have been gained for defendant through greater exposition of this evidence could have been countered by the State. We see no substantial prejudice to defendant resulting from this defect in the discovery process. We therefore, as to this ground, find no abuse of discretion in the trial court's denial of defendant's motion for mistrial.

[7] Defendant's second basis for his claim to mistrial is that the State failed to make his counsel aware of a finding by the State Bureau of Investigation that the belt buckle worn by defendant on the night of Whitaker's death had two small drops of blood on it. Again defendant argues that had he known earlier about the existence of this evidence he would have been better able to counter it. The trial court found that the prosecutor was not aware of the existence of blood on the belt buckle until the investigator, the State's final witness, testified to it at trial. The court also found that the defense had access to the investigator and possessed a copy of his report. Upon these facts the judge concluded that defendant had suffered no substantial and irreparable prejudice from the State's failure to provide this evidence prior

to trial. We hold this conclusion to be supported by the facts presented.

Undisputed evidence established that defendant had a large amount of blood on his socks and the inside of his boots and that he was within *at least* four or five feet of the victim when she was shot. The small amount of blood on defendant's belt buckle, too insufficient an amount to type, does not prove that he had to be in greater proximity. The S.B.I. investigator opined that the location of the drops of blood on the inside of the belt buckle indicated that the buckle was open or the pants were off. It is undisputed that defendant's boots were off at some time during the episode. In light of all this evidence, the fact that his belt was loosened or off is of little consequence.

In summary, the existence of blood on defendant's belt buckle added little to the evidence that went before it and was inconsequential standing alone. Defendant was not substantially and irreparably prejudiced by being denied this information prior to trial. We therefore find no abuse of discretion in the trial court's denial of defendant's motion for mistrial on this basis.

We note in passing that by our holding here, upon this particular assignment of error, we do not undermine this Court's prior position that a defect in discovery can result in irreparable prejudice. Rather, we simply find that in this case it did not.

For the foregoing reasons, we conclude that the defendant's trial was free of prejudicial error.

NO ERROR.

Justice WEBB dissenting.

I dissent because I believe inadmissible hearsay testimony was admitted which was prejudicial to the defendant.

Carl Sydney Amos testified that when he asked Mary Sue Whitaker how she had acquired a cut under her nostril, she told him the defendant had pushed her into a door. Bonnie Whitaker testified to the same effect. Carl Amos also testified that Mary Sue Whitaker told him the defendant had hit her on one occasion and grabbed and choked her on another, causing bruises on her arms and small marks on her face. Clyde W. Billings testified Mary Sue Whitaker told him the defendant had grabbed her and kicked her.

I believe these statements were introduced for the purpose of proving the defendant had assaulted Mary Sue Whitaker on several previous occasions. This was hearsay testimony and should have been excluded.

The majority says this testimony was admissible under N.C.G.S. § 8C-1, Rule 803 which provides in part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind . . . (such as intent, plan, motive, design . . .), but not including a statement of memory or belief to prove the fact remembered or believed. . . . .

I do not believe this section should have any application to this case. The majority says the disputed testimony can prove the state of mind of the deceased. I do not see how it could do so. The hearsay statements of the deceased do not say what state of mind she was in as a result of the assaults by the defendant. Apparently, we are supposed to infer her state of mind from the fact that she was assaulted.

We could infer from the fact that the deceased was assaulted by the defendant that she was afraid of the defendant. We could just as easily infer that she was outraged by the assaults, or that she hated the defendant and was determined to seek revenge. There are other possibilities. I do not believe we can say what inference can be drawn as to the deceased's state of mind at the time of each assault.

If we can conclude that the state of mind of the deceased can be inferred from her statements, the statements should have been excluded because her state of mind at the time of the assaults is irrelevant to the matters that the State had to prove in this case. Whatever the feelings of the deceased at the time she was assaulted, it did not keep her from going into a motel room with the defendant. What she felt some time before did not bear on what the defendant or the deceased did in the motel room. On the other hand, it was highly prejudicial to the defendant to allow testimony that he had on several occasions assaulted the deceased.

The majority relies on several cases. *State v. Holder*, 331 N.C. 462, 418 S.E.2d 197 (1992); *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991); *State v. Meekins*, 326 N.C. 689, 392 S.E.2d 346 (1990); *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990). I must admit that in these cases this Court has been liberal in admitting testimony in regard to statements of deceased persons under the state of mind exception to the hearsay rule. I do not believe in any of those cases we have gone as far as the majority does today.

In *Holder*, we held it was not error to admit testimony that the deceased had told persons that she had seen a gun in the defendant's pocket, that defendant had threatened her with harm and that she was scared, and that the defendant refused to leave her alone after she had tried to end the relationship. I concurred in the result in that case, saying that although these hearsay statements should have been excluded it was harmless error because of the strong evidence against the defendant. I believe the strength of the evidence in *Holder* distinguishes that case from this one.

In *Stager*, we held that a tape recording made by the decedent a few days before his death in which he expressed a fear that his wife would try to kill him was admissible. The widow of the deceased contended there had been a loving relationship between her and her husband and we said the tape recording was relevant to show the state of mind of the decedent, which showed there was not a loving relationship. There is no such consideration in this case. All the evidence is that the deceased and the defendant had a stormy relationship.

In *Meekins*, we held that testimony by a witness that the deceased had told her she was afraid of the defendant is admissible to rebut testimony by the defendant that the deceased had always been a sweet lady to him who would lend him money. There is no such evidence to rebut in this case.

In *Cummings*, we held that testimony was admissible that the deceased had said the defendant had beaten her and threatened to kill her, that she had to go to a doctor because of a place on her chest caused by the defendant's hitting her with a gun, and that she had consulted an attorney and had a warrant issued for the defendant for nonsupport of his children. The defendant contended in that case that the deceased had left their children with him. We held that the state of mind of the deceased was

relevant to show she would not have abandoned her children. There is no such contention to rebut in this case.

The contention of the State in this case is that the defendant shot and killed Mary Sue Whitaker in a motel room. The contention of the defendant is that Mary Sue Whitaker shot herself. I do not believe the state of mind of Mary Sue Whitaker, whatever it may have been, several weeks before the incident is relevant to this issue. Hearsay testimony was allowed to prove several instances of bad acts by the defendant. I do not believe this testimony is admissible under N.C.G.S. § 8C-1, Rule 803(3). I believe it is excluded by N.C.G.S. § 8C-1, Rule 404(b).

The evidence against the defendant was not strong. I believe the erroneous admission of hearsay testimony of bad acts by the defendant creates a reasonable possibility that a different result would have been reached if the error had not been made. N.C.G.S. § 15A-1443(a) (1988); *State v. Milby*, 302 N.C. 137, 273 S.E.2d 716 (1981).

I vote for a new trial.

Chief Justice Exum and Justice Frye join in this dissenting opinion.