STATE OF NORTH CAROLINA v. ERNEST LEON MYERS

No. 231A82

(Filed 9 August 1983)

1. Homicide § 18.1— premeditation and deliberation—sufficiency of evidence

  The State's evidence in a prosecution for first degree murder was sufficient to infer premeditation and deliberation where the evidence tended to show that defendant made statements to three witnesses in which he stated in substance that the victim "was supposed to get some pills for him, Preludin, and he went up and she didn't have them and she got freaked out and he beat her with a brick"; that physical evidence found at the scene tended to show that the victim was repeatedly struck about the head with a brick with such force as to break the brick into pieces; that blood consistent with the victim's blood type was splattered throughout the home; and that there was evidence tending to show that prior to the victim's death there was an attempt to smother her.

2. Homicide § 23— instructions concerning contradictory statements—"consciousness of guilt"—erroneous

  An instruction in a prosecution for first degree murder which tended to show contradictions in defendant's statements concerning his whereabouts on the day of the murder was erroneous because it permitted the jury to roam at

will without making it clear that the falsehood did not create a presumption of guilt or that, standing alone, such evidence was not sufficient to establish guilt. Neither did the trial judge inform the jury that such evidence could not be considered as tending to show premeditation and deliberation. In that the evidence in the case was entirely circumstantial, and since the witnesses upon whom the State relied to furnish the facts from which inferences of defendant's guilt were drawn were of extremely questionable credibility, there was a reasonable possibility that a different result would have been reached had the erroneous instruction not been given.

Justice MEYER dissenting.

APPEAL by defendant from *Friday, Judge*, at the 4 February 1982 Regular Session of BUNCOMBE Superior Court.

Defendant was charged by indictment, proper in form, with the first-degree murder of Gillia Dianna Hennessee. He entered a plea of not guilty.

The State offered evidence tending to show that on 22 February 1975, the body of the victim, a former nurse at St. Joseph Hospital, was found in a rondette-type dwelling in Asheville which she had vacated on 20 February 1975. She was seen leaving her newly-occupied trailer home on 21 February 1975 by a neighbor, Mr. Morrow. She did not return that evening. On 22 February, Mr. Morrow and his wife went to her former dwelling and found Ms. Hennessee's body. The police were notified and Asheville police and a S.B.I. agent came to the scene. The officers found the victim partially nude, lying face up on the floor of the rondette. They observed blood on the floor and walls in the bedroom and kitchen and on the clothing rod of a closet. The blood was later analyzed and was found to be of the same type as the victim's blood. Two halves of a brick were lying near the body. Bloodstains and hair found on the brick were determined to be consistent with Ms. Hennessee's hair and blood type. No bloodstains were found upon a pair of pants and underpants which were discovered in the kitchen area. The officers searched for fingerprints without success.

Dr. Hudson, the Chief Medical Examiner for North Carolina, witnessed an autopsy of the body which was performed by another pathologist. He observed six lacerations of the scalp and a skull fracture beneath one of the lacerations. A brick-type material was imbedded in one of the lacerations. The autopsy also revealed a fiber in the deceased's lung. Dr. Hudson stated that in

his opinion the fiber was probably taken into the lung by a breath drawn from a cloth material held over the victim's mouth and nose area about fifteen minutes before her death. In the doctor's opinion, Ms. Hennessee died as a result of blunt trauma to the head. He further testified that either of two wounds were sufficient to have caused her death. He did not observe any evidence of a sexual assault.

Alphonso Pearcy testified that he encountered defendant at the Chabaz Restaurant in Asheville around noon on 21 February 1975. When defendant inquired as to the whereabouts of a mutual friend by the name of McQueen, Pearcy offered to direct him to McQueen's residence. Defendant drove the two of them in a gold colored Toyota to a rondette located near the rondette where Ms. Hennessee's body was found. They left upon finding no one at the McQueen residence.

Mary Ellen Toreson, who lived near the rondette formerly occupied by Ms. Hennessee, testified that on 21 February she observed a yellowish brown foreign car, similar to a Toyota or Honda, parked near the Hennessee rondette. She saw a black man of medium build and height with short hair talking to Ms. Hennessee outside the rondette at about 3:00 o'clock that day. She later heard a noise coming from the Hennessee rondette but was unable to see anything except that the drapes in one of the windows were parted.

Myra Elaine Allen testified that on 21 February 1975, at about 4:00 or 4:15 p.m. as she was going to a neighbor's house to make a telephone call, she saw defendant, who she knew as "Teabags," leaving the Hennessee rondette. She stated that in 1975 she made a statement to police officers consistent with her testimony, and that she was willing to testify in court at that time. On cross-examination she admitted that her husband had been convicted of a drug violation in 1981 and that he had asked her to testify against defendant. She denied that she agreed to testify in exchange for a sentencing concession in her husband's case, but admitted that she had used narcotics in the past.

In corroboration of the witness Allen, the State offered witnesses David Moss and Delores Poole. Moss testified that he was a neighbor of Myra Elaine Allen and that she used his telephone at about 4:30 p.m. on 21 February 1975. The witness Poole

testified that about five to seven days after Ms. Hennessee's death, Mrs. Allen told her that she had seen "Teabags" leaving the Hennessee rondette.

Fred William Lee Hensley, the Chief of Police of the Asheville Police Department, testified that in 1975 he was a lieutenant on the police force and participated in the investigation of Ms. Hennessee's murder. He stated that on 11 July 1975, Mrs. Allen gave him a written statement concerning the Hennessee murder. This statement, which he read into evidence, substantially corroborated Mrs. Allen's testimony. On cross-examination he testified that in 1975 Mrs. Allen stated that she would not testify.

Robert Smith testified that in 1975 he and defendant became friendly while they were both inmates at Craggy Prison. He said that defendant made statements about a nurse. He testified that defendant said, "that she was supposed to get some pills for him, Preludin, and he went up and she didn't have them and she got freaked out and he beat her with a brick." He further testified that defendant repeated the substance of this statement to him about six months later. On cross-examination the witness stated that Delores Poole was his sister and that the witness Allen was married to his uncle. He admitted that he had been convicted of breaking and entering and possession and sale of drugs on two occasions. He stated that he was not guilty of any of these offenses.

Mary Frances Pickens testified that in November of 1975 defendant told her that he had "killed the white woman with a brick." She stated that defendant repeated the substance of this statement to her at a later date. She further testified:

And I asked him why did he kill her, and he said she was supposed to have brought him some drugs and he thought she had some money, but she didn't have no money. She just had a checkbook.

On cross-examination, the witness admitted that she had been convicted of larceny, assault, trespassing and possession of drugs. She further admitted that she engaged in lesbian activities.

Diane Lloyd testified that defendant told her that he had gone up on the mountain and killed a girl with a brick. She further stated:

What he told me was that he dressed up like a woman and he said how smooth his face was. He could wear a beard or not, and his skin was very smooth if he shaved. He dressed as a woman. He went up there and the girl—I don't remember if the door was open or not, but anyway, he was outside. He said, "Bitch, you've been fuckin' with my man," and he put his knee—kicked her in the stomach with his knee and then he started beating her in the head with a brick.

On cross-examination it was established that this witness had been convicted of attempting to pass a forged prescription and passing worthless checks. She also admitted that she had used marijuana and heroin.

Ikey Lee Noah testified that while he was an inmate at Craggy Prison he overheard a conversation between defendant and an unidentified woman. We quote the pertinent part of his testimony:

They were talking and I overheard part of the conversation. The girl looked kind of nervous and she was asking if some people might be following her. And he said, "About that nurse?" And she said, "Yeah." He said, "I don't think so. It's been about six years and as soon as my time's up, we'll leave and get out of the state. They can't prove nothing."

Billy Matthews, a special agent with the S.B.I., testified that he was assigned to investigate the murder of Ms. Hennessee and on 14 July 1975 he had a conversation with defendant. Defendant stated that the only time he had ever gone "up on the mountain" was the time he was accompanied by Alphonso Pearcy. He further told Mr. Matthews that on the morning of 21 February 1975 he had two teeth pulled and two teeth filled by Dr. Love in Black Mountain, North Carolina. At around 3:00 o'clock he picked up his wife, returned to his home and remained there for the rest of the day. In another conversation on 22 September 1981, defendant reaffirmed his statements concerning his activities on 21 February 1975.

Dr. J. H. Love testified that according to his records, he first saw defendant as a patient on 24 March 1975.

Defendant offered no evidence.

The jury returned a verdict of guilty of first-degree murder. Defendant appealed from judgment imposing a sentence of life imprisonment pursuant to G.S. 7A-27(a).[1]

*Rufus L. Edmisten, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Malcolm R. Hunter, Jr., Assistant Appellate Defender, for defendant-appellant.*

BRANCH, Chief Justice.

[1] We first consider defendant's argument that there was insufficient evidence to show that he killed Ms. Hennessee with premeditation and deliberation.

In *State v. Corn*, 303 N.C. 293, 278 S.E. 2d 221 (1981), Justice Copeland stated the rules governing the submission of a charge of first-degree murder. We quote:

> In order for the trial court to submit a charge of first degree murder to the jury, there must have been substantial evidence presented from which a jury could determine that the defendant intentionally shot and killed the victim with malice, premeditation and deliberation. *State v. Horton*, 299 N.C. 690, 263 S.E. 2d 745 (1980); *State v. Heavener*, 298 N.C. 541, 259 S.E. 2d 227 (1979); *State v. Baggett*, 293 N.C. 307, 237 S.E. 2d 827 (1977). "Substantial evidence" is that amount of relevant evidence that a reasonable mind might accept as sufficient to support a conclusion. *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). In ruling upon defendant's motion to dismiss on the grounds of insufficient evidence, the trial court is required to interpret the evidence in the light most favorable to the State, drawing all reasonable inferences in the State's

---

1. The crime for which defendant was convicted occurred on 21 February 1975. At that time the mandatory penalty for first-degree murder was death. G.S. 14-17. In *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), the United States Supreme Court declared the mandatory death penalty provision in G.S. 14-17 unconstitutional. Furthermore, our present death penalty statute, G.S. 15A-2000 *et seq.*, does not apply to this case. The effective date of G.S. 15A-2000 *et seq.* was 1 June 1977. The Legislature provided that "[t]he provisions of this act shall apply to murders committed on or after the effective date of this act." 1977 N.C. Session Laws, Ch. 406, § 8.

favor. *State v. Fletcher,* 301 N.C. 709, 272 S.E. 2d 859 (1981); *State v. King,* 299 N.C. 707, 264 S.E. 2d 40 (1980).

Premeditation has been defined by this Court as thought beforehand for some length of time, however short. No particular length of time is required; it is sufficient if the process of premeditation occurred at any point prior to the killing. *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970); *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858 (1969). An unlawful killing is committed with deliberation if it is done in a "cool state of blood," without legal provocation and in furtherance of a "fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose." *State v. Faust,* 254 N.C. 101, 106-07, 118 S.E. 2d 769, 772 (1961). The intent to kill must arise from "a fixed determination previously formed after weighing the matter." *State v. Exum,* 138 N.C. 599, 618, 50 S.E. 283, 289 (1905). *See also State v. Baggett, supra; State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974).

*Id.* at 296-97, 278 S.E. 2d at 223.

Premeditation and deliberation are mental processes and ordinarily must be proved by circumstantial evidence. *State v. Corn, supra; State v. Calloway,* 305 N.C. 747, 291 S.E. 2d 622 (1982). Among the circumstances which may be considered as tending to show premeditation and deliberation are: (1) the want of provocation on the part of the victim, (2) the defendant's conduct and statements before and after the killing, (3) threats made against the victim by the defendant, (4) ill will or previous difficulty between the parties, (5) evidence that the killing was done in a brutal manner. *See State v. Calloway, supra; State v. Potter,* 295 N.C. 126, 244 S.E. 2d 397 (1978); *State v. Thomas,* 294 N.C. 105, 240 S.E. 2d 426 (1978). The nature and number of the victim's wounds is also a circumstance from which an inference of premeditation and deliberation may be drawn, *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569, *cert. denied,* --- U.S. ---, 103 S.Ct. 503, 74 L.Ed. 2d 642 (1982), as is the number of blows inflicted upon the victim. *State v. Love,* 296 N.C. 194, 250 S.E. 2d 220 (1978); *State v. Thomas, supra.*

The State's evidence tended to show that defendant made statements to three witnesses in which he stated the manner and

motive for the murder of Ms. Hennessee. He told the witness Smith that the victim "was supposed to get some pills for him, Preludin, and he went up and she didn't have them and she got freaked out and he beat her with a brick." He in substance repeated the statement to Smith some six months later. Defendant also made a statement to the witness Mary Frances Pickens that he "killed the white woman with a brick." He indicated to Ms. Pickens that he killed Ms. Hennessee because she did not give him "some drugs" and further because he thought "she had some money." Testimony of the witness Lloyd was to the effect that defendant told her he dressed up like a woman and went to the home of the victim and beat her to death with a brick.

This evidence alone was sufficient to carry the case to the jury on the question of premeditation and deliberation. It is true that the credibility of these witnesses was questionable, but the credibility of the witness is a question for the jury. *State v. McQueen*, 295 N.C. 96, 244 S.E. 2d 414 (1978). Further, the State's evidence as to premeditation and deliberation was strengthened by the physical evidence found at the scene and the testimonial evidence of Dr. Hudson. This evidence tends to show that the victim was repeatedly struck about the head with a brick with such force as to break the brick into two pieces. Two of the blows were of such force that either of them could have caused death within a short time.

Blood consistent with Ms. Hennessee's blood type was splattered throughout the rondette and there was blood on the bottom of her feet. These facts support an inference that the victim attempted to flee and her assailant pursued and continued his attack. The brutality of the murder is accentuated by the fact that there was evidence tending to show that prior to the victim's death there was an attempt to smother her. Further, there was no evidence of provocation on the part of Ms. Hennessee.

This sustained and brutal attack without provocation on the part of the victim, together with the testimonial evidence, amply supported a jury finding that defendant acted in accordance with a fixed design or that he had sufficient time to weigh the consequences of his action.

We therefore hold that there was sufficient evidence to support a jury finding of premeditation and deliberation.

[2]   We next turn to defendant's contention that the trial judge committed prejudicial error in his instructions to the jury. He specifically maintains that the following portion of the instructions was erroneous:

> Members of the jury, there's evidence which tends to show the Defendant stated to Mr. Matthews that on the date in question, the 21st of February, 1975, that he and Pearcy went to the rondette on Howland Road and that he kept a dental appointment with Dr. Love and that he picked up his wife at work and remained home. Now, there's been further evidence from Dr. Love which says the Defendant's first appointment with Dr. Love was on March 24, 1975. Now, members of the jury, if you find from this evidence that the Defendant was not where he professed to be on February 21, 1975 and you so find beyond reasonable doubt, and that this was done to divert suspicion from himself, then you may give such weight as you find it's reasonable to do.

This portion of the instruction was requested by the State and was given over defendant's objection.

It is established by our decisions that false, contradictory or conflicting statements made by an accused concerning the commission of a crime may be considered as a circumstance tending to reflect the mental processes of "a person possessed of a guilty conscience seeking to divert suspicion and to exculpate [himself]." *State v. Redfern,* 246 N.C. 293, 297-98, 98 S.E. 2d 322, 326 (1957). The probative force of such evidence is that it tends to show consciousness of guilt. *Id. See also State v. Yearwood,* 178 N.C. 813, 101 S.E. 513 (1919); *State v. Gillis,* 15 N.C. 606 (1834).

The State takes the position that defendant was not prejudiced by the challenged instruction since the instruction failed to tell the jury that the false statements could be considered as evidence tending to show consciousness of guilt on the part of defendant. The State maintains that the instruction was in fact favorable to defendant since the jury was instructed to give this evidence "such weight as you find it's reasonable to do." At first glance, the State's argument seems plausible and the instruction itself appears to be rather innocuous. However, upon a closer study of the rationale of the cases permitting evidence of falsehoods or contradictory statements as showing consciousness

of guilt, and an application of that law to the facts of this case, we must reject the State's argument.

In *State v. Redfern, supra,* the defendant was charged with murder. The defendant made various conflicting statements about how the deceased met his death at the scene of the crime. This Court held that "[t]hese conflicting statements voluntarily made at the scene of the homicide, tend to reflect the mental processes of a person possessed of a guilty conscience seeking to divert suspicion and to exculpate herself. This line of testimony was substantial evidence of *substantial probative force,* tending to show consciousness of guilt." 246 N.C. at 297-98, 98 S.E. 2d at 326 (emphasis added) (citations omitted).

*State v. Yearwood, supra,* involved an alibi. There the defendant's mother, in his presence and with his assent, stated that the defendant was in bed at the time the alleged crime was committed. There was evidence that he was seen away from home at that time. The Court held that these facts were circumstances tending to show guilt since defendant was impliedly asserting an alibi which was contradicted by other evidence.

Our research discloses that "consciousness of guilt" may be established, *inter alia,* by evidence of flight on the part of an accused.[2] We are of the opinion that the rules of law governing flight which show consciousness of guilt are equally applicable to evidence of falsehood. We therefore find it helpful to consider the evidentiary effect of flight by an accused.

In North Carolina, evidence of flight does not create a presumption of guilt but is some evidence which may be considered with other facts and circumstances in determining guilt. However, proof of flight, standing alone, is never sufficient to establish guilt. *State v. Irick,* 291 N.C. 480, 231 S.E. 2d 833 (1977). Further, evidence of flight *may not* be considered as tending to show premeditation or deliberation. *State v. Payne,* 213 N.C. 719, 197 S.E. 573 (1938); *State v. Marsh,* 234 N.C. 101, 66 S.E. 2d 684 (1951).

---

2. We are advertent to the fact that other acts of an accused such as escape, attempted suicide, and attempts to bribe may also be evidence of implied admissions or consciousness of guilt. For the sake of brevity, we discuss only evidence of flight.

In instant case, we find the challenged instruction erroneous because it permitted the jury to roam at will without making it clear that the falsehood did not create a presumption of guilt or that, standing alone, such evidence was not sufficient to establish guilt. Neither did the trial judge inform the jury that such evidence could not be considered as tending to show premeditation and deliberation.[3] Furthermore, the statements referred to in the instruction under scrutiny were completely irrelevant since the alleged falsehood referred to defendant's whereabouts during the morning hours of 21 February 1975 and all the evidence was to the effect that the crime occurred in the afternoon of that day.

Having concluded that the instruction was erroneous, we consider whether the instruction before us was of such prejudice as to require a new trial.

G.S. 15A-1443(a) states the test for prejudicial error to be whether there is a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." The burden of showing prejudice is upon the defendant. *State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980).

The evidence in the case before us was entirely circumstantial. None of the investigatory or scientific evidence tended to point to defendant as the perpetrator of the crime. Witnesses upon whom the State relied to furnish the facts from which inferences of defendant's guilt were drawn were of extremely questionable credibility. Although we are of the opinion that the evidence was sufficient to survive a motion to dismiss, all of the circumstances present a very close question as to defendant's guilt or innocence. In addition to the matters hereinabove set forth, the trial judge's emphasis upon the negative aspect of defendant's statements to the police officers may well have left the jury with the impression that he did not find defendant's statements to be credible. *See State v. Byers*, 80 N.C. 426 (1879).

For these reasons, we are of the opinion that there was a reasonable possibility that a different result would have been

---

3. We note that the pattern jury instruction on flight, N.C.P.I.—Crim. 104.36 (1970), contains suggested language as to consciousness of guilt which may be appropriate in charging on falsehoods seeking to divert suspicion as evidence of consciousness of guilt.

reached had the erroneous instruction not been given. We therefore hold that this erroneous instruction requires a new trial.

In the present posture of this case, we do not deem it necessary to discuss defendant's contention that the trial judge improperly expressed an opinion by calling the witness, Dr. Love, to the bench at the conclusion of his testimony and engaging in a brief conversation with the doctor. Suffice it to say that the trial judge must not by words or conduct suggest an opinion as to the weight of the evidence or as to the credibility of a witness. *State v. Belk,* 268 N.C. 320, 150 S.E. 2d 481 (1966).

For the reasons stated, there must be a

New trial.

Justice MEYER dissenting.

I respectfully dissent from the majority's conclusion that the trial court's instruction concerning the import of Dr. Love's testimony constituted prejudicial error.

The majority correctly points out that "false, contradictory or conflicting statements made by an accused concerning the commission of a crime may be considered as a circumstance tending to reflect the mental processes of 'a person possessed of a guilty conscience seeking to divert suspicion and to exculpate [himself].' *State v. Redfern,* 246 N.C. 293, 297-98, 98 S.E. 2d 322, 326 (1957)." The majority characterizes the challenged instruction "at first glance" as seemingly "innocuous," and further characterizes the State's argument that the omission of the "consciousness of guilt" language was favorable to the defendant as seemingly "plausible." With these conclusions I agree.

My reading of the majority's position is that the trial judge erred in failing to include in his instruction statements to the effect (1) that the evidence, if believed, could be considered as consciousness of guilt; (2) that the evidence did not create a presumption of guilt and was not sufficient to establish guilt; and (3) that the evidence could not be used to show premeditation and deliberation. It is the omission of the latter two statements upon which the majority apparently rests its decision.

After finding error in the omission of these statements, the majority then points out, significantly, that "the statements referred to in the instruction under scrutiny were *completely irrelevant* since the alleged falsehood referred to defendant's whereabouts during the morning hours of 21 February 1975 and all the evidence was to the effect that the crime occurred in the afternoon of that day." (Emphasis added.) Defendant's alleged falsehood did nothing to establish an alibi for his whereabouts at the time of the crime; and thus, ostensibly it may not have been intended to "divert suspicion" or "exculpate" the defendant. Under these circumstances the alleged falsehood becomes not only doubtfully relevant to the question of guilt but is also reduced to insignificance for any purpose other than its value as traditional impeachment evidence. It is entirely possible, then, that the jury never reached the question of the weight to be given this evidence, having determined that it was not the purpose of this falsehood to divert suspicion.

Even assuming the jury did reach the question of the weight to be given to what amounted to an inconsistency relating to a totally different time frame (and thus a collateral matter) of no significance to the murder itself, I cannot join with the majority in its implied assumption that the jury, "roaming at will," improperly considered this evidence as proof of defendant's guilt or to establish premeditation and deliberation.

Nor do I agree with the majority's position that "the trial judge's emphasis upon the negative aspect of defendant's statements to the police officers may well have left the jury with the impression that he did not find defendant's statements to be credible." The fact that a trial judge summarizes properly presented evidence tending to show that a defendant lied in his statement to the police does not constitute an expression of opinion. G.S. § 15A-1232.

Finally, while evidence against this defendant was, indeed, circumstantial, it overwhelmingly pointed to defendant's guilt. While it is true that the relationship of some of the witnesses makes their credibility as truthful witnesses suspect, the State presented twenty-six witnesses, nine of whom either placed defendant at the scene of the crime or identified him, through defendant's own admissions to them, as the murderer of Diane

Hennessee. The jury resolved any question as to these witnesses' credibility against the defendant at trial.

I would vote to affirm defendant's conviction.