STATE OF NORTH CAROLINA
v.
TIMOTHY MARK CAPPS.
No. COA09-1011.
Court of Appeals of North Carolina.
Filed: April 6, 2010.
This case not for publication
Attorney General Roy A. Cooper, by Assistant Attorney General R. Kirk Randleman, for the State.
Haral E. Carlin, for Defendant.
BEASLEY, Judge.
Timothy Mark Capps (Defendant) appeals from judgment entered on his conviction of felonious child abuse inflicting serious bodily injury. Defendant argues that: (1) the trial court committed reversible error by denying his motion to dismiss the charge made at the end of all the evidence and (2) the trial court committed plain error by instructing the jury on false, contradictory, or conflicting statements made by Defendant. We conclude there was no error in either the denial of Defendant's motion to dismiss the charge or the jury instructions and therefore affirm the judgment of the trial court.

BACKGROUND
Defendant was indicted on 1 October 2007 and charged with felony child abuse pursuant to N.C. Gen. Stat. § 14-318.4(a3). Defendant's trial before a Rockingham County jury commenced on 12 January 2009.
T.L.[1] was born to Joni Lemons (Joni) and Defendant on 1 June 2007. Defendant lived with Joni and his daughter at the home of Joni's parents, Jackie and Todd Lemons. Late in the evening of 21 July 2007, Defendant and Joni had fallen asleep on the couch, and Defendant awoke to T.L. crying around 2:00 a.m. Defendant picked T.L. up and carried her to the changing table located in his and Joni's bedroom to change his daughter's diaper. Subsequently, Defendant awakened Joni to tell her that he had just dropped the baby and that she was not breathing. Joni awakened her parents, and they all drove T.L. to the hospital. At approximately 2:30 a.m. on 22 July 2007, six-week old T.L. was presented at the emergency room of Morehead Hospital in Eden, North Carolina by her parents and maternal grandparents. When she arrived at the hospital, she had a pulse but was unconscious and not breathing.
T.L. was immediately examined by the hospital staff, including Dr. Paul McGuire, who was accepted by the trial court as an expert in the field of emergency medicine. Dr. McGuire testified that T.L. had a pulse but was blue and not breathing, so they placed her on a breathing machine and established an IV. The emergency room staff took chest x-rays, began some laboratory work, and conducted a CT scan of her head. Dr. McGuire testified that the only visible injury was a small bruise on T.L.'s left cheek and a slight bulge in her soft spot, or fontanel, which was indicative of a head injury caused by intercranial pressure. He also said that T.L.'s temperature was a low 94.7 degrees upon her arrival at the hospital and remained low.
The results of the CT scan revealed a skull fracture on the posterior right aspect of T.L.'s skull with blood hematomas, or swelling, around the fracture and blood tracking on the left side of her brain. Dr. McGuire testified that due to the severity of T.L.'s injuries, arrangements were made to transport the baby from Morehead Hospital to the Pediatric Intensive Care Unit of Brenners Children's Hospital at the Wake Forest University Baptist Medical Center in Winston-Salem. T.L. was transferred to Brenner Children's Hospital at approximately 4:00 a.m. Witnesses for the State all testified about the severity of T.L.'s injuries, to include the fact that on the morning of 22 July 2007, Amber Garrett of Rockingham County Child Protective Services received a call regarding T.L., who was reported to have sustained a skull fracture and subdermal hematoma. Because of concerns that Defendant's story about dropping the child was inconsistent with the injuries diagnosed at that time, Ms. Garrett went to Baptist Hospital in Winston-Salem to begin an investigation and interview Defendant. She testified that Defendant told her that he and Joni had put T.L. to bed around 9:00 p.m. before they both later fell asleep on the couch. He said that at about 2:00 a.m., he woke up and T.L. had a dirty diaper, so he picked her up to take her to the changing table in his and Joni's bedroom. Defendant continued to explain to Ms. Garrett that after he changed his daughter's diaper, he picked her up, placing her head in the bend of his left arm, and reached down to pick up the dirty diaper with his right hand. At that time, T.L. slipped through Defendant's arms and fell to the carpet. Defendant told Ms. Garrett that the baby landed on her back and her head was turned to the side. Defendant stated that T.L. made no sound when she hit the floor and did not cry, and when he picked her up, she went stiff in his arms before going limp. He indicated that he woke Joni up to tell her T.L. was not breathing, and they immediately woke up Joni's parents. Joni's mother performed assisted breathing on her granddaughter while they all drove to the hospital. Defendant also told Ms. Garrett that he did not know if T.L. hit anything else as she fell to the floor. Ms. Garrett visited the home of Jackie and Todd Lemons that afternoon to investigate the area in which T.L. was allegedly dropped. The social worker observed the carpet in Joni and Defendant's bedroom to be "quite plush," and she measured the height of the changing table to be thirty-six inches. Where Defendant had indicated earlier to Ms. Garrett that his arm was approximately at the level of the top of the changing table when he dropped T.L., she concluded that, pursuant to Defendant's story, the baby would have fallen three feet.
Dr. Thomas Nakagawa, director of the Pediatric Intensive Care Unit of Brenner Children's Hospital at Baptist Medical Center, testified that he is a pediatric intensive care specialist and was accepted by the trial court as an expert witness in the areas of pediatric critical care, general pediatric medicine, and abusive head trauma. Dr. Nakagawa was consulted out of concern that the history did not match the physical findings or the significant injuries T.L. exhibited in her critically ill clinical state. He saw T.L. on 23 July 2007. Dr. Nakagawa first testified as to abusive head trauma, formerly called "shaken baby syndrome." He explained to the jury that abusive head trauma normally occurs when a much larger person shakes a much smaller person, such as an adult violently shaking a baby. The injury is not only related to shaking but can also be related to slamming or any type of impact that results in a direct blow to the child's head or where the child's head actually strikes something. Dr. Nakagawa stated that when abusive head trauma occurs, the infants are usually grabbed across the arms or under the shoulders or armpits and violently shaken back and forth very quickly.
When Dr. Nakagawa examined T.L., she was on a breathing machine because she was having seizures, had stopped breathing, and was slow to respond to stimulus. He saw no bleeding in the back of her eyes and saw no evidence of bruising. Dr. Nakagawa ordered a CT scan of T.L.'s chest to determine if there were any rib fractures, which would help show whether she had suffered abusive head trauma and ultimately whether her injuries were not the result of an accident. He continued to testify that the CT scan showed a new rear rib fracture, which in conjunction with the skull fracture and bleeding over the surface of T.L.'s brain, was consistent with non-accidental trauma. Because of her brain-surface bleeding and rib fracture, Dr. Nakagawa stated that T.L. could not have simply fallen on her head and sustained such injuries. He concluded that when he saw this type of injuries in a child who is non-ambulatory, his determination is that the injuries were inflicted and were not accidental.
When asked whether a drop from a short distance would be consistent with the injuries he observed in T.L., Dr. Nakagawa responded in the negative. He testified that children falling short distances was always concerning, especially if they landed on their necks, but they normally do not suffer injuries as significant as those T.L. exhibited. Dr. Nakagawa indicated that a child is not going to lapse into unconsciousness from such a short fall. He observed that the bleeding across the surface of T.L.'s brain was a classic sign of the head being moved back and forth during some type of traumatic event. He stated that in T.L.'s case, her head was slammed against something, which resulted in a fracture; the sudden deceleration caused the tearing of blood vessels over the surface of her brain; and her rib fractures were the result of a tremendous amount of force having been applied to her as she was picked up. Dr. Nakagawa testified that he did not believe T.L. would have cognitive function or the ability to think and perceive; she would never walk; and she would be developmentally delayed. He stated that T.L. had no significant history of any type of trauma that would result in a fractured skull and fractured ribs and then demonstrated to the jury how a child would be picked up and violently shaken. Dr. Nakagawa concluded that such shaking, even for only a few seconds, would result in severe injuries and the child would quickly lose consciousness.
Dara Garner-Edwards testified that in July of 2007, she was working for Wake Forest University Baptist Medical Center in the Brenner Children's Hospital as supervisor of the pediatric social workers. She stated that whenever a child is admitted to the pediatric intensive care unit, the social worker for that unit meets with the family to provide support and, when there is an injury which appears inconsistent with the story, conducts an assessment. Ms. Garner-Edwards testified that she was asked to speak with T.L.'s family because the doctors had determined at that time that her injuries appeared inconsistent with the history, as a fall did not appear to be the cause of T.L.'s difficulties. Ms. Garner-Edwards stated that when she interviewed Defendant, he told her that he had gotten up that night to change T.L.'s diaper and that when he reached down to get the dirty diaper, T.L. fell out of his arms. Defendant further stated that T.L. immediately stopped crying when she hit the floor and that after tensing up, his daughter went limp and her breathing changed to a low humming sound. T.L. remained unresponsive as Defendant awakened Joni and her parents before proceeding to the hospital together. Ms. Garner-Edwards also testified that upon asking Defendant about the rib fractures found on T.L., he had no explanation as to their occurrence.
Jacqueline Strand testified that she is a child protective services worker with the Rockingham County Department of Social Services. Ms. Strand interviewed Defendant twice. The first time she interviewed Defendant, he told her that when he saw the baby after she fell, her head was turned to the right. In the course of their second interview, Defendant stated T.L.'s head was turned to the left.
Dr. James Anderson first saw T.L. on 18 October 2007 and was accepted by the trial court as a medical expert in pediatric medicine. He testified that he provided care for T.L. after her release from Brenner Children's hospital. Upon initial examination, Dr. Anderson described T.L.'s difficulty breathing. T.L. would stop breathing and, due to her neurological injuries, would not resume breathing without assistance. Dr. Anderson testified that T.L. had to be fed through a gastric, or "G," tube because she did not have any gag reflexes and could not swallow. He also stated that she was not developing normally and lacked the responses that he would expect of a four-month-old infant. Dr. Anderson continued to explain how T.L.'s brain had atrophied as a result of her injury.
When asked if the injuries he had observed in T.L. were consistent with Defendant's explanation that the child had fallen out of his arms, Dr. Anderson replied, "Absolutely not." He testified that he sees between six and seven thousand children a year, including a number of children who have fallen out of cribs or rolled off changing tables. Dr. Anderson concluded that he would not expect to see the severity of injuries that T.L. had sustained in a child who had allegedly fallen three feet because her degree of intercranial injury suggested a much greater impact caused the damage. He stated that his prognosis for T.L. was that she would always be a total-care child and doubted that she would ever be able to be fed by any method other than gastric tube.
Defendant testified that T.L. rolled out of his arms when he turned after changing her diaper at 2:00 a.m. He said that he did not see her land but that her face was turned to the left when he looked down. Defendant said that he did not try to catch his daughter as she fell, first explaining that he wanted to get back to bed and then saying he was being careless and not paying attention.
Following the presentation of evidence, the jury found Defendant guilty of one count of felonious child abuse resulting in permanent or protracted loss or impairment. The trial judge found Defendant to be a Record Level II offender and sentenced him to a minimum of 100 months and a maximum of 129 months in the North Carolina Department of Corrections. Defendant gave oral notice of appeal in open court.

MOTION TO DISMISS
Defendant argues that the trial court erred by denying his motion to dismiss the felony child abuse charge made at the close of all the evidence because there was insufficient evidence to convince the jury of Defendant's guilt beyond a reasonable doubt. We disagree.

Standard of Review
Under the statutory law of North Carolina, a defendant may move to dismiss a criminal charge when the evidence presented is insufficient to sustain a conviction. See N.C. Gen. Stat. § 15A1-227(a) (2007). "The denial of a motion to dismiss for insufficient evidence is a question of law, which this Court reviews de novo." State v. Bagley, 183 N.C. App. 514, 523, 644 S.E.2d 615, 621 (2007) (internal citation omitted).
When a defendant in a criminal trial makes a motion to dismiss a charge against him on the ground that there is not sufficient evidence, the appropriate standard of review "`is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.'" State v. Scott, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (quoting State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)). "`Substantial evidence' is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion[.]" State v. Garcia, 358 N.C. 382, 412, 597 S.E.2d 724, 746 (2004) (internal citation omitted); see also Scott, 356 N.C. at 597, 573 S.E.2d at 869 ("Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion.").
This "test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both," and "[c]ircumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." Scott, 356 N.C. at 596, 573 S.E.2d at 869 (internal quotation marks omitted); see also State v. Williams, 184 N.C. App. 351, 355, 646 S.E.2d 613, 616 (2007) ("The trial court is not required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying a defendant's motion to dismiss." (internal quotation marks omitted)). Where the evidence is circumstantial in nature,
the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.
Scott, 356 N.C. at 596, 573 S.E.2d at 869 (internal quotation marks omitted).
"When determining the sufficiency of the evidence to support a charged offense, we must view the evidence `in the light most favorable to the State, giving the State the benefit of all reasonable inferences'" which may be drawn therefrom. State v. Ridgeway, 185 N.C. App. 423, 433, 648 S.E.2d 886, 893-94 (2007) (quoting State v. Benson, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992)). "`Any contradictions or discrepancies arising from the evidence are properly left for the jury to resolve and do not warrant dismissal.'" State v. Parker, 185 N.C. App. 437, 440-41, 651 S.E.2d 377, 380 (2007) (quoting State v. King, 343 N.C. 29, 36, 468 S.E.2d 232, 237 (1996)).

Analysis
Defendant was charged and convicted with Class C felony child abuse inflicting serious bodily injury under N.C. Gen. Stat. § 143-18.4(a3). To sustain a conviction thereunder, the State must prove the following elements of the offense: (1) Defendant was "[a] parent or any other person providing care to or supervision of a child;" (2) such child was "less than 16 years of age" at the time; and (3) Defendant "intentionally inflict[ed] any serious bodily injury to the child or . . . intentionally commit[ted] an assault upon the child which result[ed] in any serious bodily injury to the child, or which result[ed] in permanent or protracted loss or impairment of any mental or emotional function of the child." N.C. Gen. Stat. § 14-318.4(a3) (2007). Where it is undisputed that Defendant is the father of T.L. and that T.L. has not yet reached her sixteenth birthday, Defendant argues only that the State failed to tender substantial evidence that he intentionally inflicted serious bodily injury upon T.L. Accordingly, we limit our review to the same.
The intent element under N.C. Gen. Stat. § 14-318.4 is "`sufficiently established if a defendant intentionally inflicts injury that proves to be serious on a child of less than sixteen years of age in his care[;]' `[h]e need not specifically intend that the injury be serious.'" Williams, 184 N.C. App. at 356, 646 S.E.2d at 617 (quoting State v Campbell, 316 N.C. 168, 172, 340 S.E.2d 474, 476 (1986)). This Court has previously held:
Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. In determining the presence or absence of intent, the jury may consider the acts and conduct of the defendant and the general circumstances existing at the time of the alleged commission of the offense charged.
State v. Riggsbee, 72 N.C. App. 167, 171, 323 S.E.2d 502, 505 (1984). Riggsbee also stands for the proposition that "when an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries." State v. Liberato, 156 N.C. App. 182, 186, 576 S.E.2d 118, 120-21 (2003) (citing Riggsbee, 72 N.C. App. at 171, 323 S.E.2d at 505).
In the case sub judice, although there is conflicting evidence presented by the State and Defendant as to the cause of T.L.'s injuries, the record reflects that the State put forth several medical experts who testified that T.L.'s injuries were consistent with non-accidental trauma. Doctors Nakagawa and Anderson both testified that in their expert opinion, T.L.'s injuries were intentionally inflicted. They opined that dropping the six-month-old baby from a distance of three feet, as advanced by Defendant, could not have generated enough force to inflict the injuries they personally observed in T.L. Moreover, there is no evidence that any other adult or parent had any participation in the occurrence that resulted in T.L.'s unstable condition, nor is it disputed that T.L.'s injuries were sustained while she was in the exclusive care of Defendant. Accordingly, we hold that the State put forth sufficient evidence to circumstantially establish that the injuries were intentionally inflicted by Defendant.
Defendant argues in his brief that several of the State's witnesses, including Joni and both of her parents, testified to the care and love exhibited by Defendant for his daughter. When specifically asked what she thought happened to T.L., Joni responded that she believed Defendant accidentally dropped T.L. Both Jacki and Todd Lemons testified that they had never seen Defendant treat his daughter in any way that concerned them. Defendant contends that because these three witnesses know him better than anyone else and presented no evidence that T.L.'s injuries were anything more than an accident, the evidence was insufficient to withstand his motion to dismiss. However, "[w]hen ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence." Scott, 356 N.C. at 596-97, 573 S.E.2d at 869.
"To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence excludes every reasonable hypothesis of innocence would in effect constitute the presiding judge the trier of facts. Substantial evidence of guilt is required before the court can send the case to the jury. Proof of guilt beyond a reasonable doubt is required before the jury can convict. What is substantial evidence is a question of law for the court. What that evidence proves or fails to prove is a question of fact for the jury."
Powell, 299 N.C. at 101, 261 S.E.2d at 118-19 (quoting State v. Stephens, 244 N.C. 380, 383-84, 93 S.E.2d 431, 433-34 (1956)); see also State v. Smith, 40 N.C. App. 72, 79, 252 S.E.2d 535, 540 (1979)("If the trial court determines that a reasonable inference of the defendant's guilt may be drawn from the evidence, it must deny the defendant's motion and send the case to the jury even though the evidence may also support reasonable inferences of the defendant's innocence.").
This Court has held several times that testimony by treating physicians and experts that injuries were not accidental, but rather intentionally inflicted, constituted substantial evidence to support the jury's guilty verdict. See, e.g., State v. Wilson, 181 N.C. App. 540, 543, 640 S.E.2d 403, 406 (2007) (finding agreement by treating physicians and medical experts that injuries were intentionally inflicted, where defendant presented no rebuttal experts, sufficient although contrary to defendant's testimony in her own defense). Defendant does not challenge that T.L. has sustained serious bodily harm. Moreover, the nature of T.L.'s injuries and the surrounding circumstances support a finding that Defendant intentionally inflicted such harm. Accordingly, there was sufficient proof before the jury of this third element of felony child abuse under N.C. Gen. Stat. § 14-318.4 (a3) (2007). We therefore conclude that the State presented substantial evidence on each essential element of the crime, and the trial court was correct to leave the resolution of any conflicts or discrepancies therein for the jury without dismissing the charge. See Parker, 185 N.C. App. at 441, 651 S.E.2d at 380 ("If there is more than a scintilla of competent evidence to support the allegations . . . it is the court's duty to submit the case to the jury." (internal quotation marks omitted). Because there was sufficient evidence as to each element of the offense charged and that Defendant was the perpetrator thereof, this assignment of error is overruled.

JURY INSTRUCTIONS
Defendant contends the trial court committed plain error in instructing the jury on North Carolina Pattern Jury Instruction 105.21 for false, contradictory, or conflicting statements of Defendant. Defendant argues that such instruction was not supported by the evidence at trial and was highly prejudicial against him. We disagree.
Preliminarily, we note that Defendant did not object to the jury instruction at trial; therefore this argument is relegated to plain error review. See State v. Oakman, 191 N.C. App. 796, 798, 663 S.E.2d 453, 456 (2008) ("A defendant who does not object to jury instructions at trial will be subject to a plain error standard of review on appeal.").

Standard of Review
"Under the plain error standard of review, defendant has the burden of showing: `(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial.'" State v. Jones, 358 N.C. 330, 346, 595 S.E.2d 124, 135 (2004) (quoting State v. Bishop, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997)). As stated by our Supreme Court:
"[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a `fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or `where [the error] is grave error which amounts to a denial of a fundamental right of the accused[.]'"
State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir. 1982)). "In deciding whether a defect in the jury instruction constitutes `plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." Odom, 307 N.C. at 661, 300 S.E.2d at 378-79. Moreover, "even when the `plain error' rule is applied, `[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.'" Id. at 660-61, 300 S.E.2d at 378 (quoting Henderson v. Kibbe, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)).

Analysis
The trial court gave the following instruction regarding the relationship of false, contradictory, or conflicting statements to the intent of Defendant:
The State contends and the Defendant denies that the Defendant made false, contradictory or conflicting statements. If you find that the Defendant made such statements, they may be considered by you as a circumstance tending to reflect the mental process of a person possessed of a guilty conscience seeking to divert suspicion or to exonerate the person. And you should consider that evidence along with all the other believable evidence in this case. However, if you find that the Defendant made such statements, they do not create a presumption of guilt and such evidence standing alone is not sufficient to establish guilt.
See N.C.P.I  Crim. 105.21 (Supp. 2008). "The probative force of such evidence is that it tends to show consciousness of guilt." State v. Myers, 309 N.C. 78, 86, 305 S.E.2d 506, 511 (1983). Defendant points to the cautionary note preceding the pattern jury instruction, which states: "This instruction is only proper where the defendant's statements and/or trial testimony is contradictory to highly relevant facts proven at trial. However, this instruction should not be used if the statements are completely irrelevant and without substantial probative force in tending to show a consciousness of guilt." N.C.P.I.  Crim. 105.21. Defendant cites Myers in his brief for the proposition that it is erroneous for the trial judge to instruct on false, contradictory, or conflicting statements when the statements under scrutiny are completely irrelevant. See Myers, 309 N.C. at 87-88, 422 S.E.2d at 511-12. Our Supreme Court, however, has held that such instruction "is proper not only where defendant's own statements contradict each other but also where defendant's statements flatly contradict the relevant evidence." State v. Walker, 332 N.C. 520, 538, 422 S.E.2d 716, 726 (1992).
Defendant argues that his statements to T.L's mother and grandparents, law enforcement, social workers, and medical care providers were entirely consistent with each other. He further contends that each of those statements were also consistent with the testimony that he gave to the jury during the course of his trial. Focusing on the fact that there was no evidence presented to show that his statements were false, contradictory, or conflicting with prior statements he made or with his testimony before the jury, Defendant contends that the jury instruction was not supported by the evidence of the case. Defendant, however, overlooks the fact that his statements that his daughter fell three feet out of his arms onto a carpeted floor, although consistent with each other, flatly contradicted the testimony of both expert doctors. Dr. Nakagawa stated that "it comes down to my conclusion that these injuries were inflicted. They were not accidental injuries." Dr. Anderson corroborated such a conclusion when asked if the injuries sustained by T.L. were consistent with Defendant's explanation and responding, "Absolutely not." Both doctors described the amount of impact necessary to inflict the degree of injuries sustained by T.L., including her fractured rib and skull, to be far greater than that which could have been generated from a three-foot fall. These contradictions go to the heart of that which the jury was asked to determine  whether Defendant possessed the requisite intent to sustain a conviction for felony child abuse. Such contradictions brought to light by a comparison of Defendant's testimony and statements to others with the experts' evidence at trial were highly probative not only on the issue of credibility but also because they tended to show Defendant's mental process. Accordingly, we hold that the inconsistencies between Defendant's explanation and the expert testimony introduced at trial were not "completely irrelevant" and in fact had "substantial probative force, tending to show consciousness of guilt." Id. Therefore, the trial judge did not commit error by instructing the jury on false, contradictory, or conflicting statements made by Defendant, and consequently, there can be no plain error. This assignment of error is overruled.
For the foregoing reasons, we conclude that Defendant had a fair trial, free from prejudicial error.
No Error.
Judges MCGEE and STEELMAN concur.
Report per Rule 30(e).
NOTES
[1] Initials are used to protect the identity of the juvenile.